## MAYOR AND CITY COUNCIL OF BALTIMORE
*v.* WILLIAM T. BIERMANN

[No. 44, October Term, 1946.]

*Decided January 15, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Simon Schonfield, Assistant City Solicitor of Baltimore City,* with whom was *Simon E. Soboloff* on the brief, for the appellant, Mayor and City Council.

*R. Lewis Bainder* and *Wirt A. Duvall, Jr.,* for appellant, Upper Park Heights Association of Baltimore City.

*Ernest F. Fadum* and *John S. McDaniel, Jr.,* with whom was *Karl F. Steinmann* on the the brief, for the appellee.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from an order of the Baltimore City Court reversing the action of the Board of Zoning Appeals of Baltimore City, and granting the appellee a permit to construct a gasoline filling station at the southeast corner of Park Heights Avenue and Rodgers Ave.

Application for the permit was filed initially with the Buildings Engineer, denied in accordance with the provisions of paragraph 34A of the Zoning Ordinance, and referred to the Board of Zoning Appeals. After due

notice and hearing, an inspection of the premises, and consideration of the testimony and documents submitted, the Board denied the permit. In the minutes of the Board is this notation: "Two members of the Board voted for the resolution [to deny the permit] and three members voted against the resolution. There being an insufficient number of votes for the permit, the Board ruled that the application stands disapproved." Upon appeal to the Baltimore City Court no additional evidence was produced. The case was heard by the court upon the record certified to it by the Board of Zoning Appeals. The record disclosed the following facts:

The property in question is an irregular, vacant, corner lot, with a frontage of 99.54 feet on Park Heights Ave. and 116.13 feet on Rodgers Ave. Both streets carry a heavy burden of traffic. The plans submitted with the application call for a concrete block building containing an office, two rest rooms and storage rooms, a two bay lubritory, four 3,000 gallon tanks, four pumps, an electric sign and two 35-foot concrete driveways to each street. The plans and specifications were tentatively approved by the Chief Engineer and the Buildings Engineer as in compliance with the Building Code, by the Health Department and the Fire Department. The Police Department also reported that the proposed structure would "in no way interfere with the free movement of traffic in that vicinity." It was testified that the lot in question is not within 300 feet of any building used as a school, church, moving picture theatre, theatre or public park, and is not within 600 feet of a hospital. On the other three corners there are stores, and on Park Heights Ave. adjoining the property are other stores. The neighborhood is primarily residential, however, and the Arlington primary school is situated nearby on the south side of Rodgers Ave. Part of the school grounds are within 300 feet of Park Heights Ave., but the school building itself is situated more than 300 feet from the west line of the lot in question, approximately 150 feet beyond the restricted area.

A great many residents of the neighborhood protested the application, and none supported it. The principal ground of protest was that the proposed station would be a danger anpd hazard to the children who attend the school, some 1,100 in number, ranging in age from 5 to 11. Many of these children take a bus or trolley at the corner where the proposed station would be located. It was also testified that there are eleven filling stations on Park Heights Ave. within three or four blocks of the proposed location, that filling stations in that vicinity have reached a "saturation" point, and that the site should be reserved for other necessary commercial uses in the growing, suburban community. Some of the protestants also stressed the fire hazard, pointing out that most of the residences in that area are of frame construction. The trial court found from the weight of the evidence that the station "would not affect the health, comfort, morals, welfare or safety of the people nearby," and that there was a public need for the service contemplated.

The Buildings Engineer exercised no discretion in refusing the application. Paragraph 34A of the ordinance provides that "applications for a permit for any of the uses enumerated in Paragraph 34 shall be made to the Buildings Engineer. No such permit shall be issued until application shall have been approved by the Board òf Zoning Appeals * * *." The effect of this provision was to confer original, rather than appellate, jurisdiction upon the Board. Paragraph 34 (2) (as amended by Ordinance 318, approved January 16, 1937) provides that "a filling station and/or tanks and/or pumps for the sale at * * * retail of inflammable liquids in a use district where permitted by the use regulations * * * may be permitted in such a use district * * * only after a public hearing before the Board of Zoning Appeals, and compliance with the terms and conditions hereinafter set forth. Provided, however, that no building or structure of any kind shall hereafter be erected, altered or used for the sale of gasoline or any other motor fuel, on any lot or premises where any of the boundaries

of such lot or premises are within three hundred (300) feet of the boundary line of any public park, public square, or public playground or of any building or structure used as a church, orphanage, school, theatre or motion picture theatre * * * or within six hundred (600) feet of any building or structure used as a public hospital * * *." Under paragraph 7, dealing with First Commercial Use Districts, filling stations are not forbidden, but under paragraph 34A they may not be constructed without the prior approval of the Zoning Board. It appears to be conceded that the lot in question is not so close to the school, or school grounds, as to come within the prohibition of the proviso. Prior to 1937, the city dealt with filling stations by special ordinances. *Kramer v. Mayor and City Council of Baltimore,* 166 Md. 324, 171 A. 70. Compare *Ellicott v. Mayor and City Council of Baltimore,* 180 Md. 176, 23 A. 2d 649.

Section 7 of the Enabling Act, Code, Art. 66B, Sec. 7, provides that "The concurring vote of four members of the board shall be necessary to reverse any order, requirement, decision, or determination of any such administrative official, or to *decide in favor of the applicant on any matter upon which it is required to pass under any such ordinance,* or to effect any variation in such ordinance." Paragraph 32 (i) of the Ordinance provides: "The concurring vote of four members of the Board shall be necessary to reverse any order, requirement, decision or determination of the Buildings Engineer, or *to decide in favor of the applicant on any matter upon which it is required to pass under this ordinance,* or to effect any variation in this ordinance." (Italics supplied.) As applied to variations, such a provision is not uncommon. "In framing the building zone resolution of the City of New York it was considered that inasmuch as the grant of a variance permit allowed the applicant to do something that his neighbors could not do under the strict application of the law, the favorable vote of the board should be greater than a mere majority." *Bassett, Zoning* (1940 Ed.) p. 119. See also *Metzenbaum, Law of Zoning* (1930 Ed.) p. 269.

Paragraph 34B provides. "The Board of Zoning Appeals shall fix a reasonable time for the hearing as well as give due notice to the parties in interest. The Board of Zoning Appeals shall inspect the premises and shall hold a public hearing, giving all parties in interest the right to testify to any material facts in connection with the proposed use, and shall act as a fact-finding body and shall approve or disapprove the issuance of the permit for the proposed use in accordance with the evidence adduced before it and from its own investigation as to whether or not such proposed use would menace the public health, safety, security or morals, and as a further guide to their decision upon the facts of the case, they shall give consideration to * * * (8) the size, type and kind of structures in the vicinity where the public is apt to gather in numbers, such as theatres, churches, hospitals, schools and the like."

The Enabling Act, Code Art. 66B, Sec. 7, provides that any person aggrieved by any decision of the Board "May present to a court of record a petition * * * setting forth that such decision is illegal, in whole or in part, specifying the grounds of the illegality." The court "May take evidence * * * [or cause evidence to be taken by an examiner] which shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may reverse or affirm, wholly or partly, or may modify the decision brought up for review. * * * An appeal may be taken to the Court of Appeals from any decision of the said Court of Record reviewing the decisions of the Board of Zoning Appeals." The Baltimore City Zoning Ordinance, paragraph 35, repeats the authorization and designates the Baltimore City Court as the court of record.

From these provisions it appears that in every case in which the Board of Zoning Appeals acts in the first instance (and not on appeal from action of the Buildings Engineer), any decision of the Board in favor of the applicant is conditioned upon a concurrence of four of its five members; that its action in passing upon an

application of the type in question must rest upon a consideration and determination of the pertinent facts; and that the legality of its action, at least, is reviewable by the courts. In the case at bar two members voted against approval of the permit, and the case thus presents a novel question as to the scope of judicial review under the circumstances.

In the recent case of *Heath v. Mayor and City Council of Baltimore*, 187 Md. 296, 49 A. 2d 799, 803, in passing upon the appeal provisions of this same ordinance, we said: "It is well established that the Court will not substitute its discretion for that of the board. The function of the board is to exercise the discretion of experts, and the Court, although it may not arrive at the same conclusion, will not disturb a decision on review where the board has complied with all legal requirements of notice and hearing, and the record shows substantial evidence to sustain the finding." In that case the action of the Court, affirming the Board's unanimous action in granting a special exception in a Residential Use District, was reversed because there was "No supporting evidence upon which to base a rational judgment." See also *Colati v. Jirout*, 186 Md. 652, 47 A. 2d 613. Compare *Board of Com'rs of Anne Arundel County v. Snyder*, 186 Md. 342, 46 A. 2d 689.

The petition for appeal in the case at bar alleges that the refusal of the Board to grant the permit was "illegal, in that there was no evidence before it to justify a refusal * * * and that the action of the two members of said Board who voted against the issuance of said permit did so capriciously and without justification in law." These allegations were denied in the answers, and the case was tried below upon that issue. No attack was made upon the validity of the Enabling Act and Ordinance under which the Board acted. It is urged that there was substantial evidence to support a finding by the minorty members that the proposed station would create a hazard because of its proximity to the school, a factor that the Board was specially directed to consider, or a finding that there was no public necessity

for another station in the neighborhood. It is contended that the action of the minority members, which controlled the Board's action, was therefore not capricious or illegal, and that the trial court erred in substituting its judgment for that of the Board. On the other hand, it is contended that the action of the minority prevented the Board from making a determination of fact, and that under these circumstances the trial court was justified in weighing the evidence, and deciding that the permit should be issued without regard to the Board's action.

We are inclined to agree that where disapproval rests upon a mere failure to obtain the concurring vote of four out of five members, the action cannot properly be described as that of a fact-finding body. In such circumstances it would be more accurate to say that approval is prevented by the exercise of a veto power. And negative action of this sort is clearly not entitled to the same weight, in considering the merits of a controversy, as a positive determination. But on the other hand, the statute requires concurrence as a condition precedent to the issuance of the permit, and failure to concur cannot be deemed as illegal action, even though it may defeat or qualify the other requirement of the statute that the Board act as a fact-finding body. It is our duty to reconcile conflicting provisions of the statute so as to give effect to both, where possible. *Bickel v. Nice,* 173 Md. 1, 6, 192 A. 777. We hold that although the Board was precluded, by the adverse vote, from acting as a fact-finding body, this fact did not render its action a nullity, or open the question to unlimited review. The question before us is not whether there was substantial evidence before the Board to support a minority finding, but whether there was a reasonable basis in fact to support the refusal as an exercise of the police power. *Ellicott v. Baltimore,* 180 Md. 176, 23 A. 2d 649; *Kramer v. Baltimore, supra; Pocomoke City v. Standard Oil Co.,* 162 Md. 368, 159 A. 902. Compare *Anne Arundel County Com'rs v. Ward,* 186 Md. 330, 46 A. 2d 684, and cases cited.

Considering the action of the Board as an exercise of delegated legislative, or quasi legislative, power, the scope of review is different and in some respects more limited than where the action is quasi judicial; *e.g.*, the court must find that the result of the action is beyond the police power and deprives the applicant of property without due process of law. On this question the property owner has the heavy burden of overcoming the presumption of constitutionality of legislative action, even if the legislative body acted without evidence at all. Before the present statute this was the nature of review of a refusal by the mayor and city council to grant a permit. *Kramer v. Baltimore, supra; Compare Pocomoke City v. Standard Oil Co., supra.* If the legislature substituted, for an absolute prohibition, an authority to grant a permit subject to the veto of a minority of the Board, the burden of setting aside the negative action is no less than in the case of an absolute prohibition. In *Larkin Co. v. Schwab,* 242 N. Y. 330, 151 N. E. 637, the Enabling Act required approval, in the case of a permit for a gasoline filling station, by the concurring vote of more than a majority of the city council. The New York Court of Appeals found this requirement consistent with due process. See also *Fortieth St. & Park Ave., Inc. v. Walker,* 133 Misc. 907, 234 N. Y. S. 708, and *Green Point Sav. Bank v. Board of Zoning Appeals Town of Hempstead,* 281 N. Y. 534, 24 N. E. 2d 319 (appeal dismissed 309 U. S. 633, 60 S. Ct. 719, for want of a substantial federal question).

Upon the evidence in this record, with regard to the peculiar hazard to school children at this location and the large number of filling stations in the vicinity, we hold that there was no lack of reasonable support for a denial of the permit under the police power. Compare *Phillips Oil Co. v. Municipal Council of City of Clifton,* 120 N. J. L. 13, 197 A. 730.

*Order reversed, with costs.*