## ADLER *v.* MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

[No. 44, September Term, 1959.]

624

*Decided November 19, 1959.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ.

*Wilson K. Barnes,* with whom was *William M. Hudnet* on the brief, for appellant.

*Mary Arabian, Assistant City Solicitor,* and *Melvin J. Sykes,* with whom were *Harrison L. Winter, City Solicitor,* and *Melvin S. Silberg* on the brief, for appellees.

HAMMOND, J., delivered the opinion of the Court.

Once again a natural desire to sell land for a use that will bring the highest price has run into the protests of neighboring home owners who feel that the proposed use will hurt

their way of life and depreciate the value of their properties. As a result, there has come about an appeal from the affirmance below of the action of the zoning board in refusing to allow a filling station at the northeast corner of Wabash and Sequoia Avenues in Baltimore.

The owner of the corner had developed much of the immediate area, having built houses on Wabash Avenue to the south of the lot in question and garden-type apartment houses on both sides of Wabash Avenue for several blocks to the north. When he built the apartments he reserved a strip of land on the east side of Wabash Avenue, running for three hundred feet to its intersection with Sequoia Avenue, for future use as a shopping center. The proposed filling station would occupy about one-half of the reserved lot. The whole of the lot is zoned Second Commercial, as it has been since the original zoning of the City in 1931. Except for a building across Sequoia Avenue to the south housing a drugstore and a food store, the rest of the neighborhood is wholly zoned residential.

Considerably below the level of Wabash Avenue, to the east (and, so, to the east of the lot in question), lie the tracks of the Western Maryland Railway. The presence of the railroad did not deter the building and occupancy of nice homes along it, the rears of which overlook it, because the tracks are far below the level of the houses, and trees and shrubbery have been planted, screening them from view. To afford a pedestrian continuation of Sequoia Avenue, which dead-ends for vehicular traffic just east of Wabash, a wooden foot bridge crosses the railroad right-of-way, with long, steep steps going down to grade at its east end.

The plats, pictures and testimony in the record show the area north of Liberty Heights Avenue, beginning with Wabash Avenue and extending westward, to be almost entirely residential with many substantial detached cottage-type dwellings. South of the proposed site on Wabash Avenue are cottages on the west side and row houses on the east side. There are row houses on both sides of Sequoia Avenue and garden-type apartment houses on both sides of Wabash Avenue to the north for three blocks. In the neighborhood are a

Methodist Church, a Christian Science Church, and a Synagogue and School to which several hundred children, many of whom cross the intersection in question, go on Sundays and on weekdays. Public School No. 18, on Druid Park Drive, is attended by many children who live in the neighborhood. To reach it they cross the foot bridge over the Western Maryland Railway, passing, as they come and go, the lot on which the station is proposed to be built.

Several hundred nearby home owners rose in articulate and emphatic protest to the locating of the station in their area and the witnesses waxed almost lyrical in their descriptions of the neighborhood, saying that it was "one of the most beautiful sections in Baltimore" and that there was nothing "lovelier in town." Witnesses, including those who live across from the site of the proposed station, testified that their homes would depreciate in value and attractiveness if the station were built.

There are two clusters of gasoline stations beyond but relatively near the immediate residential area. On Liberty Heights Avenue towards Druid Park Drive, there are four stations; to the northwest of the area there is a commercial development with a cluster of seven filling stations. A substantial amount of traffic passes the corner in question. Sequoia Avenue enters Liberty Heights Avenue by way of Wabash, and Dolfield Avenue joins Sequoia at Hilton Village, carrying traffic to and from the commercial area on Dolfield Avenue, as well as serving as a through route for traffic from Reisterstown Road across Garrison Boulevard to Dolfield Avenue and down Liberty Heights Avenue.

The intersection of Wabash and Sequoia Avenues is unusual in several respects. As it approaches from the south, Wabash Avenue bends into Sequoia to the west, and the prevailing flow of traffic is not north and south on Wabash. Vehicles coming north on Wabash usually swing to the left into Sequoia, and vehicles coming east on Sequoia generally bear to the right into Wabash. In addition, Rosedale Road, a one-way street north-bound, empties traffic into the intersection at the bend of Wabash Avenue into Sequoia. The Rosedale Road traffic and traffic approaching the intersection from

the opposite direction on Wabash (from the north to the south), converge on the larger flow of traffic rounding the bend between south Wabash and Sequoia.

There was unanimity in the testimony of the neighbors that the corner was dangerous not only to children but to adult pedestrians, and that there have been a number of accidents there. Indications are that traffic will increase. Since the hearing a new road has been opened extending Wabash Avenue south to Gwynns Falls Parkway, which increases traffic from Reisterstown Road to Liberty Heights Avenue and, in the future, Wabash Avenue is to become a main artery feeding the expressway. Traffic from Rosedale, Dolfield, Sequoia and Wabash south, using the proposed filling station, would have to cut across the flow of traffic travelling Wabash Avenue south to Liberty Heights Avenue.

The Board found that although the Fire Department, the Commissioner of Health, and the Department of Transit and Traffic had approved the proposed station, an examination of the premises and the testimony at the hearing showed the neighborhood to the north, west and south to be residential in character, and that the "lights, glare and noise incidental to the operation of a gasoline station would adversely affect living conditions in these dwellings. * * * The testimony shows that the traffic at the bi-section of Wabash Avenue by Sequoia Avenue is now congested and dangerous. The future plans for the street layout will increase that traffic and the filling station would increase the traffic hazard."

The Board continued its findings by saying: "the proposed gasoline filling station would adversely affect the occupants of buildings nearby by reason of the emission of noise, dust and gases. The proposed illumination would result in glare which would adversely affect the surrounding sleeping quarters, would adversely affect the use of the outdoor moving-picture theatre, would adversely affect the peaceful enjoyment of the neighboring dwellings, would adversely affect traffic on the present streets and on the proposed streets in this neighborhood," and, so, found that the filling station would menace the public health, safety, security and morals.

The lot owner argues that the official certificates from the

Fire Department, the Health Department, and the Department of Traffic and Transit all approve the proposed station, and that there was no testimony before the Board to controvert their findings that the public health, safety, security and morals would not be menaced, so that the action of the Board in turning down the application was arbitrary and illegal. In acting on an application for a filling station, the Board exercises original jurisdiction under Sections 37-39 of the Baltimore City Zoning Ordinance (1958 Ed.), which, under Sec. 35 (i), allows a filling station only with the approval of at least four of the five members.

In the instant case it is conceded that the lot in question was not so close to any of the kinds of buildings listed in Section 37 of the Ordinance as to be specifically and automatically prohibited. Therefore, in reaching its decision the Board was required to find, under Section 39 of the Ordinance, whether the proposed use would menace the public health, safety, security and morals, and "as a further guide to their decision upon the facts of the case" to give consideration of the eight tests or standards listed. Governmental determination of proper locations for filling stations has been a problem since zoning began. In Baltimore approval of the legislative body, the City Council, was required until 1937, and since then the approval of the Board of Municipal and Zoning Appeals, exercising the delegated legislative authority, has been a prerequisite. Whether the approval needed was that of the Council or the Board, this Court consistently has held that the test of the validity of the refusal to allow a filling station at a given site is not whether the action is supported by substantial evidence, and not whether the court agrees with the findings, or the result, but rather whether there was a reasonable basis to support the refusal as an exercise of the police power. To state it conversely, the court will not upset the refusal unless the bounds of the police power have been exceeded and the applicant deprived of his property without due process of law. *Kramer v. Mayor and City Council,* 166 Md. 324; *Mayor and City Council v. Biermann,* 187 Md. 514; *Hoffman v. Mayor and City Council,* 187 Md. 593; *Maryland*

*Advertising Co. v. Mayor and City Council*, 199 Md. 214; *Gilmor v. Mayor and City Council*, 205 Md. 557.

In the *Biermann* case two members of the Board voted against allowing the filling station and three voted to allow it. The two negative votes were sufficient to bar the filling station under what is now Section 35 (i) (then Section 32 (i)) of the Ordinance, which repeats the requirement of the Enabling Act, Code (1957), Art. 66B, Sec. 7 (i). The same contentions were made in the *Biermann* case as are made now—that all official certificates approved the establishment of the filling station and there was no substantial evidence to support the votes of the vetoing Board members. Judge Henderson said for the Court (pp. 522-523) that "* * * although the Board was precluded, by the adverse vote, from acting as a fact-finding body, this fact did not render its action a nullity, or open the question to unlimited review," and added: "The question before us is not whether there was substantial evidence before the Board to support a minority finding, but whether there was a reasonable basis in fact to support the refusal as an exercise of the police power. * * * Considering the action of the Board as an exercise of delegated legislative, or quasi legislative, power, the scope of review is different and in some respects more limited than where the action is quasi judicial; *e.g.,* the court must find that the result of the action is beyond the police power and deprives the applicant of property without due process of law. On this question the property owner has the heavy burden of overcoming the presumption of constitutionality of legislative action, even if the legislative body acted without evidence at all." The Court found that by reason of the peculiar hazard to school children at the proposed location of the filling station and the large number of filling stations in the vicinity, "* * * there was no lack of reasonable support for a denial of the permit under the police power."

In the *Hoffman* case there were also the same contentions that are made in the case at bar. The official certificates as to fire, health and traffic supported the establishment of the filling station and it was vigorously argued that there was no evidence in the case to contradict those certificates. The

Court said (p. 597) that "* * * the recommendation of one or more of these city officials would not preclude the Board or the court on review of the Board's action from considering other matters contained in the record. If this were not so, then a permit would be automatically issued upon the recommendation of these officials. * * * The recommendation of these officials is to be given consideration by the Board, in connection with the other facts in the case, and if the Board, based on evidence to the contrary, does not agree with the recommendation of these officials it is not required to follow their recommendation." In sustaining the Board the case held that its action, if correct, could be upheld by the Court on a ground not raised or relied on by the Board. The Court took judicial notice of the fact that the addition of a filling station to the number already in the predominantly residential area would add unreasonably to the fire hazard caused by the concentrated storage and dispensing of gasoline (although the Board had not so held), and said (p. 602): "* * * the condition surrounding the site of this proposed filling station does not harmonize with the conclusion that the security and safety of the people in that vicinity would not be menaced."

In the *Maryland Advertising Co.* case the Board had denied an application for a billboard (which is subject to the same general restrictions and conditions as a filling station, under Sections 37-39 of the Ordinance) on the ground that it would sandwich an adjacent new commercial building between two billboards, making it invisible from the sides, and visible only from the front. The Court held that the same reasoning would bar the building of any structure on lots adjacent to a commercial building and, in effect, would deprive the owner of the adjacent lots of the right to build anything on them. The Court found that the decision bore no relation to the public health, safety, security, morals or general welfare, and was arbitrary and invalid. It would seem that the Court thought that the Board's action, in effect, deprived the owner of any reasonable use of his land, as indicated by the citation of *Nectow v. City of Cambridge,* 277 U. S. 183, 72 L. Ed. 842, a confiscation case.

The *Gilmor* case recognized and applied the principles of the *Biermann, Hoffman* and *Maryland Advertising* cases in affirming the allowance of a billboard.

There can be no doubt that in the case before us the lot owner is not deprived of the reasonable use of his land by the refusal to allow him to sell for the building of a filling station. It is quite apparent that many reasonable uses remain to him, such as the shopping center he originally contemplated. Undoubtedly, stores or other commercial establishments could be built on the lot and, perhaps, the garden-type apartment houses to the north profitably could be continued to Sequoia Avenue. That the use denied is more valuable than those that remain is not decisive. *Serio v. Mayor and City Council,* 208 Md. 545; *Marino v. Mayor and City Council,* 215 Md. 206.

We cannot say, on the record before us, that the presumption of the constitutionality of the unanimous action of the five members of the Board has been rebutted or that the Board did not have reasonable support for a denial under the police power of the lot owner's application. The lot in question is a very short commercial littoral to a large residential sea. Past the lot, at an intersection that is characterized as congested and dangerous, flows heavy traffic in unusual patterns. There will be even heavier traffic in the future, and the filling station would add volume to the present and future volume and complications to the safe passage of vehicles traveling in and out of it, and near it. Many school children daily pass along both the Wabash Avenue side and the Sequoia Avenue side of the lot on which the station would be built. In the words of the *Biermann* case, the station could have been found to offer a "peculiar hazard" to these children.

The Board and the Court below must be affirmed.

*Order affirmed, with costs.*