# SHELL OIL COMPANY *v.* MAYOR AND CITY COUNCIL OF BALTIMORE ET AL.

[No. 274, September Term, 1960.]

464

*Decided June 12, 1961.*

The cause was argued before BRUNE, C. J., and HAMMOND, PRESCOTT, HORNEY, and SYBERT, JJ.

*Stuart R. Wilcox,* for appellant.

*John A. Dewicki, Assistant City Solicitor,* with whom were *Harrison L. Winter, City Solicitor, Ambrose T. Hartman, Deputy City Solicitor,* and *Hurley Cox* on the brief, for appellees.

PRESCOTT, J., delivered the opinion of the Court.

This is an appeal by the Shell Oil Company, a corporate lessee of a parcel of land located at the southeast corner of Erdman Avenue and Edison Highway, in Baltimore City, from an order of the Baltimore City Court, affirming a decision and resolution of the Board of Municipal and Zoning Appeals (Board), which decision denied the appellant's request for a permit and necessary approval to erect and operate a gasoline filling station.

In·acting upon an application for a permit to erect a filling station, the Board exercises original jurisdiction under Sections 37-39 of the Baltimore City Zoning Ordinance (1958), which, under Section 35 (i), requires the affirmative vote of at least four of the five members of the Board before a permit may be granted. In the instant case, there were only two of such affirmative votes.

In accordance with the provisions of Section 38, the plans, specifications and the relevant data were submitted to the Board of Fire Commissioners, Commissioner of Health and Traffic Commission (now the Department of Transit and Traffic), all of whom approved the granting of the permit.

The lot in question is irregular in shape and binds along the southeast side of Edison Highway and the southwest side of Erdman Avenue, at their intersection. It is presently improved by a one-story, brick building, used as a real estate office. The named streets do not intersect at right angles. Edison Highway comes into Erdman Avenue at about an angle of fifty degrees. Directly across Edison Highway from the lot there is a cemetery. Directly across Erdman Avenue, there is a residential zone improved with rows of dwellings which front towards the premises in question. To the southwest, there is a 10 foot alley binding along the rear yard of a row of dwellings which are in a Residential Use District and which front on Lawnview Avenue. The lot is distant only a few feet more than 300 feet from the building used as a church at the northwest corner of Erdman Avenue and Cliftmont Avenue. Erdman Avenue and Edison Highway are each 100 feet wide divided by median strips at this location and are heavily traveled thoroughfares.

At the hearing before the Board, a Mr. Woodward, in behalf of the applicant, offered an architect's conception of the site, as it would appear after the proposed improvements.

Dr. Ewell then qualified as a traffic expert, and stated he had made an inspection and study of the corner in question. His written report, filed with the Board, pointed out that the proposed station would be located at the intersection of two dual-lane streets, but that this would establish no precedent— there are many such locations in Baltimore where filling sta-

tions are enjoying safe and successful operations. The traffic records showed that over 2500 vehicles, in one hour, have passed the corner in the southeastward lane of Erdman Avenue during the morning peak, and over 1250 vehicles have moved in the same direction during the evening peak; and that 430 vehicles have been recorded moving northward along Edison Highway during the morning rush hour, and 1180 per hour have been counted in the evening. Clockwise and counterclockwise turning movements around the southeast corner of the intersection are insignificant—amounting to no more than 20 vehicles per hour. The report further stated that ingress to the proposed station would be a simple and safe operation, and egress would be safe during the stop time of the signalized intersection; that the median strips would allow only traffic traveling northward on Edison Highway and southeastward on Erdman Avenue to enter and leave the proposed site. After also pointing out that pedestrian traffic at the intersection to and from the nearby schools is controlled in the morning and afternoon by two policewomen, the report stated that, in Dr. Ewell's opinion, "the erection and operation of a new service station at the site will create little or no impact on the existing traffic situation."

Dr. Ewell stated, on cross-examination, that there are many movements of vehicles off Edison Highway turning and moving northward up Erdman Avenue, which represented "a particularly heavy flow" of traffic; and that there is "a very heavy flow" on the opposite side of the median strip, in the afternoon, moving northward on Erdman Avenue, and, perhaps, 1000 vehicles per hour move northward on Edison Highway "down towards the station." He further stated that he recalled about 900 vehicles per hour making left-turns from Edison Highway into Erdman Avenue, and these figures were obtained when Sparrows Point and Bethlehem Ship Yards were not working at full capacity—the figures from the Department of Transit and Traffic, taken at an earlier date, might exceed 1500 per hour.

Dr. Ewell was succeeded as a witness by Carl Heinmuller, Jr., whose qualifications as a real estate appraiser were admitted. After stating that he had made a study of the subject

property and giving his reasons for his conclusion, it was his opinion that "the use of this property for a gasoline service station would not affect adversely the value of the residences nearby." However, when it was called to his attention on cross-examination that the filling station, if erected, would be only some 20 to 25 feet from the rears of the lots facing on Lawnview Avenue and he was asked if he intended to testify that the erection of the proposed service station would have no effect on these properties, he qualified his opinion, after some "shadow-boxing," by stating that he thought "it highly unlikely [that] the proposed use considered alone would affect the value of this property, taking into consideration the neighborhood as it exists."

A lighting expert, a Mr. Whitley, was then called by the applicant. It was his opinion that the proposed lighting would tend to supplement the existing inadequate street lights at the intersection, and that, with the use of the proposed fluorescent lighting, being completely adjustable, all direct illumination from this source could be retained within the service station lot lines or a spillage area of adjacent rights-of-way. In his opinion, the additional lights would not cause annoyance to the occupants of nearby dwellings.

The applicant called, as its final witness, a civil engineer, who testified that there were water mains in both adjacent streets; that the subject property was accessible for fire protection from both streets; and that the erection of a service station would create no unusual fire hazard.

The opponents were then offered an opportunity to present their protests. Harold E. Hicks, the president of the Belair-Edison Improvement Association, which had a membership of some 2,000 persons, stated that this association had unanimously resolved to oppose the granting of the permit. He stated that the "intersection" was a "very bad corner," where, because of the unusual angles formed by Erdman Avenue and Edison Highway at the junction and the merging of Mannasota Avenue and Brehms Lane slightly east of the intersection, five streets come together. He testified that at present the school children from three schools pass the intersection, and a fourth, with an anticipated enrollment of 2,500 students, was

in the course of construction. He felt certain that the erection of the proposed filling station would increase the traffic hazard, and that the lights, bell-ringing and long hours of operation of such a station would annoy the nearby residents and depreciate some of their properties to the extent of at least $1,500.

Four City Councilmen from the Third District, one of whom had resided in said District for 28 years, opposed the application. Their testimony, summarized, stressed the unusual nature of the intersection, the heavy flow of traffic, the large number of school children who crossed the intersection, the annoyance to nearby residents, and the detrimental effect on property values in the vicinity.

Reverend Roskamp, the pastor of the church located 301 feet from the subject property, was the last witness for the opponents. The substance of his testimony was to the effect that in hot weather it became necessary to open the windows and doors of the church, and any increase in noise would interfere with the church services.

The applicant then called William T. Davis of the Department of Transit and Traffic. His records disclosed that there were, roughly, six accidents a year at the intersection in question.

The written resolution of the Board is dated June 27, 1960, and states that the resolution was passed on June 21, 1960. The resolution is full, and, obviously, was prepared with care. It recites the details of the application for the permit; the giving of public notice of the hearing; an inspection by the Board of the premises; a study of the premises and neighborhood; and the public hearing. The resolution then describes the subject property and the nearby vicinity. It notes that the streets are on an incline, and, in the judgment of the Board, the erection and operation of a gasoline filling station at the proposed location "would result in considerable increase in the hazards to traffic, both pedestrian and vehicular"; that the occupants of nearby dwellings would be subjected to additional noise, dust and gases; and that the illumination of the station would adversely affect the nearby dwellings and sleeping quarters. The resolution continues

by stating that the existing filling stations in the vicinity were sufficient to serve the community; that the proposed filling station would be directly in front of the dwellings across Erdman Avenue; that the Board had given due consideration to the standards set forth in Section 39; and that the Board, in accordance with the above findings, concludes "the proposed gasoline filling station would menace the public health, safety, security and morals," and therefore the application is disapproved.

The decision of the Board was appealed to the Baltimore City Court, where the Board's action was affirmed; and the appeal to this Court followed.

Upon the record, as it has been outlined above, the appellant contends: (1) that the Board "did not reach its decision in the instant case 'in accordance with the evidence adduced before it,' but that its findings and its decisions were based upon political and emotional reactions, which had the effect of denying the appellant the use of its property without due process of law," nor could the Board have based its findings upon its own inspection and investigation of the site; (2) that there was no factual evidence in the record to support the findings of the Board, nor was there anything in the resolution to justify its findings based upon the Board's personal inspection of the site; (3) that the hearing was held in "an atmosphere charged with emotion and feeling against its position," and the evidence indicates that the decision of the Board "was a direct result of the clamor of the property owners and their political representatives"; (4) that the Board could not have read its "many and complete and written reports" of expert witnesses, because the Board announced its decision "only several hours" after the conclusion of the hearing, during which time the Board had "many other cases to hear and consider," and this constituted a denial of due process of law; and (5) that Judge Harlan, in his opinion, simply affirmed the mistakes made by the Board.

## I, II, III.

It will be noted that these contentions of the appellant overlap; hence, they will be considered together. In its brief, the appellant attempts to sustain them by a rather extended argu-

ment to the effect that the Board should have accepted the appellant's evidence at face value, and should have paid little, or no, heed to its own inspection of the subject premises and the evidence of the protestants. Section 39 of the Zoning Ordinance, in fixing guides and standards, provides, *inter alia,* as follows: "The Board * * * shall inspect the premises and hold a public hearing, giving all parties in interest the right to testify as to any material facts * * * and shall approve or disapprove the issuance of the permit * * * in accordance with the evidence adduced before it *and from its own investigation* [italics supplied] as to whether or not such proposed use would menace the public health, safety, security or morals * * *" and they shall give consideration to the following:

* * *

"(5) Protection of occupants of buildings from noise, dust and gases caused by traffic.

"(6) The type of electric illumination for the proposed use with special reference to its effect upon nearby structures and the glare, if any, from such illumination in surrounding sleeping quarters * * *.

* * *

"(8) The size, type and kind of structures in the vicinity where the public are apt to gather in numbers, such as * * * churches, * * * schools and the like.

"(9) The proximity of dwellings and the effect such uses have, if any, upon the peaceful enjoyment of such dwellings.

* * *

"(11) The conservation of property values.

"(12) Any other matters considered to be in the interest of the general welfare."

The uncontroverted facts in the record, we think, disclose a reasonable basis to support the Board's refusal to issue the permit, as an exercise of the police power. *Adler v. City of Baltimore,* 220 Md. 623, 155 A. 2d 504. There is no doubt that the reasonable protection of the public health and safety is a proper exercise of the police power. The plat of the

vicinity of the proposed site shows an unusual intersection, due to the angles formed by the convergence of the several highways. The streets are not level. A very heavy flow of traffic at the intersection, with numerous turns, is shown by the appellant's own expert witness. It is undisputed that students from three schools (with a fourth under construction) use the intersection. A public church is located just 301 feet away from the proposed location of the filling station. The appellant's application called for 6 floodlight poles, 8 fluorescent floodlights, fluorescent island light fixtures at the pump islands, two sign poles, one SHELL sign, one rotating SHELL sign (both signs with interior illumination and about 17 feet high), and one air tower. The proposed station would open at about 6:30 a.m. and close at about 10:30 or 11:00 p.m. There was testimony that there were sixteen, or more, filling stations within a radius of one mile of the proposed site. The plat also shows that the service station, if erected, would directly face the dwellings across Erdman Avenue, and be only a few feet distant from the rears of the lots that face on Lawnview Avenue. The reports from the Fire Commissioners, the Commissioner of Health and the Department of Transit and Traffic are made to aid the Board, but they are not controlling.

The Zoning Ordinance (Section 35 (k)) directs that the Board "shall study zoning, its development, application and relation to public and private municipal development * * *." And Section 39, as we have stated above, requires the Board to inspect the premises and give due regard to the evidence produced before it at the hearing and its own investigation when deciding whether a permit should issue. In making their decision, the Board members perform their duty as experts. *Aaron v. City of Baltimore,* 207 Md. 401, 406, 114 A. 2d 639. We hold that the record clearly shows a reasonable basis to support the Board's refusal to issue the permit, as an exercise of the police power.

This brings us to the alleged political and emotional aspect of the hearing, advanced by the appellant. A short answer to the argument is that the record is devoid of any showing of disorder or any improper conduct during the hearing. The

contention seems to be based entirely upon the fact, mentioned only in appellant's brief, that there was some hand-clapping and cheers during the taking of testimony and that certain City Councilmen testified. The record shows that a public hearing was held; all of the witnesses, who desired to testify, were fully heard; there was no coercion, intimidation or browbeating of any witness; all of the exhibits offered by the appellant were received; and the resolution thereafter passed by the Board shows a knowledge of the relevant facts involved in making a determination of whether the permit should issue.

The testimony of the Councilmen was short, and, in the main, stressed the increased hazards to traffic, the possible injury to the health of nearby residents, and the adverse effect on property values, if the station were permitted. Insofar as the record discloses, there has been no denial of due process of law.

### IV

In this assignment of error, the appellant complains that the Board announced its decision only a few hours after the hearing, and, therefore, could not have read the complete and lengthy reports of its experts. The record shows that the experts had testified at the hearing, giving the highlights of their written opinions, which were filed with the Board. The record extract contains two of the written reports, and neither of them is long. Together, they consume a little over five pages, and it probably would take the average person six or seven minutes to read them. Consequently, this contention does not seem, necessarily, to be based upon fact; but, in any event, we know of no regulation or law that requires the Board to study and deliberate on an application for any particular length of time, and, in the absence of a showing that the Board's conclusion was arbitrary, whimsical or capricious, or that there was a denial of due process of law, we would not be justified in reversing the order appealed from.

### V

What has been said above answers this contention.

*Order affirmed, with costs.*