# CROWN CENTRAL PETROLEUM CORPORATION
## *v.* MAYOR AND CITY COUNCIL OF BALTIMORE, ET AL.

[No. 314, September Term, 1969.]

*Decided May 7, 1970.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN and SINGLEY, JJ.

*Morton A. Sacks,* with whom were *Cable, McDaniel, Bowie & Bond* on the brief, for appellant.

*Simon Schonfield, Assistant City Solicitor,* with whom were *George L. Russell, Jr., City Solicitor,* and *Clayton A. Dietrich, Chief Assistant Solicitor,* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 90 *infra.*

In 1948, Crown Central Petroleum Corporation (Crown Central) erected a gasoline filling station at Park Heights and Rogers Avenues in Baltimore. It chose for a site an historic battleground where William T. Biermann had lost his fight to build a filling station in January of 1947. The administrative denial of his application had been reversed by the Baltimore City Court but his hopes were scuttled by *Mayor & C.C. of Baltimore v. Biermann,* 187 Md. 514, 50 A. 2d 804 (1947), in which our predecessors reversed the order of the Baltimore City Court.

The bare record before us does not disclose how or why Crown Central was able to build its station, when Biermann was not. But the facts which were before us in 1947, and the law which we then applied have retained surprising vitality and relevance after the passage of 23 years.

The present controversy commenced in February of

1969, when Crown Central filed an application for a permit to reconstruct and enlarge its filling station with Baltimore's Department of Housing and Community Development.

Crown Central proposed to expand its original site, which in *Biermann* had fronted some 99 feet on Park Heights Avenue and some 116 feet on Rogers Avenue, by adding about 50 feet along the southeast boundary of the site, thus increasing the Park Heights frontage to about 150 feet. The number of gasoline pumps would be increased from two to 10, and the plans also included the installation of a one-bay coin operated car wash.

Because the Zoning Ordinance (the Ordinance), Baltimore City Code (Everstine Ed. 1966) Art. 30 §§ 41 (2) and (5) confers on the Board of Municipal and Zoning Appeals (the Board) original jurisdiction over applications for filling stations and for car washes, "where automobile washing is the prime use of the lot," and because the front yard requirements imposed by § 32 of the Ordinance were not met, the Zoning Commissioner disapproved the application. On the same day, Crown Central appealed to the Board.

The Board posted the property, inspected the premises, held a hearing, and issued an order granting the application for the reconstruction of the filling station, but denying the application for authority to install the car wash. Crown Central appealed to the Baltimore City Court. From an order of that court affirming the Board and entering judgment in favor of the City, this appeal has been taken.

Crown Central would have us overturn the judgment for two reasons: (i) the denial of the application for the car wash was without any reasonable evidentiary basis and is therefore arbitrary, capricious and illegal; and, (ii) the trial court erred when it held there was a reasonable basis to support the Board's refusal to allow the car wash as an exercise of the police power. Since the contentions are but two facets of the same proposition, we shall consider them together.

This Court, in *Mayor & C.C. of Baltimore v. Biermann, supra*, 187 Md. 514, had before it not only the same property, but the same contention. In *Biermann*, Judge (later Chief Judge) Henderson, speaking for the Court, discussed the standard to be applied in cases where the Board exercises original jurisdiction:

"Considering the action of the Board as an exercise of delegated legislative, or quasi legislative, power, the scope of review is different and in some respects more limited than where the action is quasi judicial; *e.g.*, the court must find that the result of the action is beyond the police power and deprives the applicant of property without due process of law. *On this question the property owner has the heavy burden of overcoming the presumption of constitutionality of legislative action, even if the legislative body acted without evidence at all.*" 187 Md. at 523. (Emphasis supplied).

*Biermann* was followed by *Adler v. Mayor & C.C. of Baltimore*, 220 Md. 623, 155 A. 2d 504 (1959), another gasoline filling station case. There, the Court, speaking through Judge (now Chief Judge) Hammond, said at 628:

"* * * Governmental determination of proper locations for filling stations has been a problem since zoning began. In Baltimore approval of the legislative body, the City Council, was required until 1937, and since then the approval of the Board of Municipal and Zoning Appeals, exercising the delegated legislative authority, has been a prerequisite. Whether the approval needed was that of the Council or the Board, this Court consistently has held that the test of the validity of the refusal to allow a filling station at a given site is not whether the action is supported by substantial evidence, and not

> whether the court agrees with the findings, or the result, but rather whether there was a reasonable basis to support the refusal as an exercise of the police power. To state it conversely, the court will not upset the refusal unless the bounds of the police power have been exceeded and the applicant deprived of his property without due process of law (citing cases)."

This language was most recently quoted by Judge Barnes, speaking for the Court in another gasoline station case, *Mayor & C.C. of Baltimore v. Muller,* 242 Md. 269, 219 A. 2d 91 (1966).

Crown Central makes much of the fact that when the Board, as required by § 43 of the Ordinance, submitted the application to the Board of Fire Commissioners, the Commissioner of Health, and the Department of Transit and Traffic for recommendation and report, the several agencies interposed no objection. Similarly, the Department of Planning approved the application submitted to it under § 41 (6) (4), which requires applications for car washes to be submitted.

The same contention was made and disposed of in *Mayor & C.C. of Baltimore v. Muller, supra; Shell Oil Co. v. Mayor & C.C. of Baltimore,* 225 Md. 463, 171 A. 2d 234 (1961) ; *Adler v. Mayor & C.C. of Baltimore, supra,* and in *Hoffman v. Mayor & C.C. of Baltimore,* 187 Md. 593, 51 A. 2d 269 (1947). *Adler* adopted the language of *Hoffman,* where we said:

> "* * * We might comment here that the recommendation of one or more of these city officials would not preclude the Board or the court on review of the Board's action from considering other matters contained in the record. If this were not so, then a permit would be automatically issued upon the recommendation of these officials. Of course, this is not so. The Board of Zoning Appeals is the lawful agency to pass upon an application for a permit to erect a gaso-

line station, and the recommendation of these city officials was not intended to prevent the Board from either granting or refusing a permit. The recommendation of these officials is to be given consideration by the Board, in connection with the other facts in the case, and if the Board, based on evidence to the contrary, does not agree with the recommendation of these officials it is not required to follow their recommendation. * * *" 187 Md. at 597-98.

The only testimony at the hearing before the Board was that of G. Kenneth Holmes, Crown Central's real estate representative. He explained that Crown Central's proposal envisaged the installation of a one-bay coin operated car wash, which was entirely automatic; that a car could be washed in five minutes, or six cars in a half hour; that the entrance to the car wash would be from Park Heights Avenue; and that 10 spaces for automobiles waiting to use the car wash would be provided, as required by § 41 of the Ordinance. The revelant colloquy followed:

"(The Chairman) What happens if you get an overflow of customers?

"(Mr. Holmes) There will be an attendant to direct traffic off the road. To date, we haven't had any overflow at any of our locations.

"(The Chairman) That [Park Heights Avenue] is a heavy traffic artery, as you well know.

"(Mr. Holmes) Most of them are, Mr. Ricciuti [the Chairman]. We are directing the attendant to make sure the road is clear along here.

"(Mr. Murphy) [counsel for Crown Central] I think, sir, the present People's location on Ritchie Highway at Church Street just south of the City is closest to this of any in the immediate area.

"(Mr. Holmes) Correct.

"(Mr. Murphy) And in heavy traffic, too.

"(Mr. Holmes) Right, terrific."

Several days after the hearing, the Board filed its order. After reciting that the Board had inspected the premises and had made a study of the neighborhood, as it is required to do in cases of original jurisdiction by § 44 of the Ordinance, the order concluded:

"The Board is of the opinion that the reconstruction of the gasoline service station would not be detrimental to the neighborhood nor would it have an adverse effect upon the area, but it is the Board's opinion that a car wash bay at the corner of the heavily traveled Park Heights Avenue and Rogers Avenue would be dangerous at this intersection and would cause motor vehicles to stand on the street creating a very hazardous situation. The Board finds no justification for permitting the car wash bay to be added at this location.

"With due consideration to the guides and standards set forth in Section 44 of the Zoning Ordinance and to the reports of the several City departments as required by the Zoning Ordinance, the Board finds that the proposed reconstruction of the service station would not menace the public health, safety, security or morals, but denies the permission to operate the coin operated car wash.

"In accordance with above facts and findings the Board approves the reconstruction of the service station but disapproves the one-bay, coin operated car wash."

Crown Central argues that even in the exercise of the Board's original jurisdiction there must be evidence adduced at the hearing sufficiently substantial for it reasonably to conclude that the application should be denied, and that the knowledge or opinion of the members of the Board cannot serve as a basis for the conclusion it reached. That this principle is applicable when the Board acts in a quasi judicial capacity is not open to question.

*Board of County Comm'rs v. Ziegler*, 244 Md. 224, 223 A. 2d 255 (1966) ; *Hedin v. Bd. of County Comm'rs*, 209 Md. 224, 120 A. 2d 663 (1956) ; *Temmink v. Bd. of Zoning Appeals*, 205 Md. 489, 109 A. 2d 85 (1954) ; *American Oil Co. v. Miller*, 204 Md. 32, 102 A. 2d 727 (1954), all relied on by Crown Central.

This argument misses the point, however. When the Board is exercising its original jurisdiction, it is acting in a legislative or quasi legislative capacity, and as we have endeavored to indicate, the test is not whether the result which it reached is supported by substantial evidence, or even by any evidence, but whether there was a reasonable basis in fact to support the refusal as an exercise of the police power, *Mayor & C.C. of Baltimore v. Muller, supra*, 242 Md. 269; *Mayor & C.C. of Baltimore v. Biermann, supra*, 187 Md. 514, 522; *Ellicott v. Mayor & C.C. of Baltimore*, 180 Md. 176, 23 A. 2d 649 (1942) ; *Kramer v. Mayor & C.C. of Baltimore*, 166 Md. 324, 171 A. 70 (1933) ; *Pocomoke City v. Standard Oil Co.*, 162 Md. 368, 159 A. 902 (1932).

The Board is specifically charged by § 44 with the power "to approve or disapprove the issuance of the permit for the proposed use in accordance with the evidence adduced before it and *from its own investigation* as to whether or not such proposed use would menace the public health, safety, security or morals." There follow in § 44 the separate guides and standards to be considered by the Board in original jurisdiction cases, among them traffic problems, incorporated by reference to § 2 of the Ordinance.

For Crown Central to prevail, it must meet the heavy burden of overcoming the presumption of the constitutionality of legislative action, *even if the legislative body acted without any evidence at all, Mayor & C.C. of Baltimore v. Biermann, supra*, 187 Md. at 523. The lower court commented that the Board's findings based on viewing and study were not as specific as they might have been, see *Mayor & C.C. of Baltimore v. Muller, supra*, 242 Md. at 280 and *Hoffman v. Mayor & C.C. of Balti-*

*more, supra,* 187 Md. at 601-02, where similar findings were held adequate, but the lower court found legally sufficient the conclusion that a car wash at a busy intersection would create a hazardous situation.

The court below concluded that there was a reasonable basis to support the Board's disapproval of the application as an exercise of the police power and that the refusal was neither arbitrary, unreasonable or capricious, or a denial of due process. On the record before us, we cannot say that the Board did not have reasonable support for its denial of the application or that the presumption of the constitutionality of the Board's action was rebutted.

The Board and the court below must be affirmed.

> *Judgment affirmed, costs to be paid by appellant.*

BARNES, J., dissenting:

Although I agree with substantially all of the statements in the majority opinion in regard to the applicable law generally, I dissent because, in my opinion, the Board is required to *state in its decision* the *facts* on which it allegedly found from its own investigation of the site in question that the proposed car wash would create a traffic hazard.

It must be kept in mind that the exercise by the Board of its original jurisdiction under Article 30, Sections 41 to 44 of the Baltimore City Zoning Ordinance (Baltimore City Code, Everstine, 1966 Ed.) is a *delegated* and *restricted legislative* power, and is not the exercise of legislative power by a legislative body itself. It is well established that when a legislative body delegates a legislative power to an administrative agency, the legislative body, itself, must establish sufficient guides and standards for the exercise of the delegated legislative power by the administrative agency in order to make the grant of legislative power constitutional. See *Marek v. Baltimore*

*County Board of Appeals,* 218 Md. 351, 146 A. 2d 875 (1958).

In the grant of the delegated legislative power involved in the present case, the City Council did establish sufficient guides and standards and otherwise limited and restricted the exercise of the delegated legislative power by the Board. Article 30, Section 44, Baltimore City Code (1966). Two of the principal requirements are that the Board *"shall* act as a fact-finding body" and that it *"shall* approve or disapprove the issuance of the permit for the proposed use *in accordance with the evidence* adduced before it and *from its own investigation* as to whether or not such proposed use would menace the public health, safety, security or morals. . . ." Then, as a further guide to its *"decision upon the facts* of the case," it is provided that the Board *"shall* give consideration" to twelve relevant matters including the guides and standards set forth in Sections 2 and 39 (j) of Article 30. (Emphasis supplied.)

As I construe these limitations upon the exercise by the Board of the delegated legislative power, it is mandatory that the Board base its approval or its disapproval of the issuance of a permit in accordance with the evidence adduced before it and, if the Board relies upon *facts* which it discovers from its own investigation, it must enunciate those facts both in the record and in its decision. Only this procedure will allow a reviewing court to be able to determine whether the Board's decision was indeed based upon facts from which the Board could reasonably conclude that the proposed use would menace the public health, safety, security or morals and whether all twelve of the particularly enunciated guides and standards were considered by the Board. Apart from constitutional requirements of due process of law, this requirement is, in my opinion, indicated by the provision of Section 39 (c) of the Zoning Ordinance that:

> "The Board shall keep minutes of its proceedings, showing the vote of each member upon each question, or, if absent or failing to vote, in-

dicating such fact, and *shall keep records of its examinations and other official actions, all of which shall* be immediately *filed* in the office of the Board and *shall be a public record."* (Emphasis supplied.)

In short, in my opinion, the zoning ordinance *requires* the Board to keep and file a record of any facts it finds and relies upon from its own investigation of the site in the determination of a zoning case.

I am also of the opinion that the requirements of due process of law as set forth in Art. 23 of the Declaration of Rights in the Maryland Constitution require that such facts be set forth in the Board's decision. There is no other way a court can ascertain that the delegated exercise of the police power is properly exercised by the Board and that the necessary guides and standards for a constitutional delegation of the legislative power have been properly considered by the Board. Unless this be done, the parties and their counsel will be afforded no opportunity to challenge or rebut the "facts" on which the Board relies. The great weight of authority in this country indicates that when a Board of Zoning Appeals seeks to rely upon facts observed by it on its own investigation, it must state these facts in its decision. The result of the decisions generally is summarized in Rathkoff, *The Law of Zoning and Planning* (3rd Ed.), as follows:

43-14. "The board may, of course, inspect the site and use the knowledge so gained, as well as personal knowledge of any other pertinent facts, in arriving at a determination but the facts so ascertained or known must be set forth in the record so that the court, on review, can scrutinize the basis of the decision."

\* \* \*

64-7. "Where the determination of the board is based wholly or in part upon the personal examination of the premises by members of the board or upon their personal knowledge of the

locale and conditions affecting it, such facts as are revealed by examination or known to the board members should be stated and certified, together with the record of the testimony given by others and the exhibits introduced."

\* \* \*

64-8. "The board's findings alone, without a statement of the facts on which the board's findings were based, are insufficient."

Cases supporting these statements by Rathkoff are: *Stolz v. Ellenstein,* 7 N. J. 291, 81 A. 2d 476 (1951); *Buckminster v. Zoning Bd. of Review of City of Pawtucket,* 68 R. I. 515, 30 A. 2d 104 (1943); *Hopkins v. Bd. of Appeals of City of Rochester,* 178 Misc. 186, 33 N.Y.S.2d 396 (1942); *People, ex rel. Fordham Manor Reformed Church v. Walsh,* 244 N. Y. 280, 155 N. E. 575 (1927); *Consolidated Edison Co. of N. Y., Inc. v. Town of Rye,* 16 Misc.2d 284, 182 N.Y.S.2d 688 (1959); and *Tireman—Joy—Chicago Improvement Ass'n v. Chernick,* 361 Mich. 211, 105 N.W.2d 57 (1960).

Chief Judge (later Mr. Justice) Cordozo stated it well for a unanimous Court of Appeals of New York in *People, ex rel. Fordham Manor Reformed Church v. Walsh,* 244 N. Y. 280, 155 N. E. 575 (1927) *supra,* as follows:

"Without any witnesses at all, it [the board] may act of its own knowledge, for, as constituted by the statute \* \* \* it is made up of men with special qualifications of training and experience. In that event, however, it must set forth in its return the facts known to its members but not otherwise disclosed." (244 N. Y. at 287, 155 N. E. at 577.)

\* \* \*

"Disclosure is the antidote to partiality and favor." (244 N. Y. at 291, 155 N. E. at 578.)

See also *Barry v. O'Connell,* 303 N. Y. 46, 100 N.E.2d 127 (1951) in which the Court of Appeals of New York

cites with approval and quotes from the opinion of the Supreme Court of the United States in *Securities and Exchange Commission v. Chenery Corp.*, 332 U. S. 194, 196-97, 67 S. Ct. 1575, 1577, 91 L. Ed. 1995, 1999 (1947) as follows:

> "If the administrative action is to be tested by the basis upon which it purports to rest, that basis must be set forth with such clarity as to be understandable. It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive."

It is significant that in Section 44 of the Baltimore City Zoning Ordinance, the Board is mandatorily required to "inspect the premises" *before* it holds the public hearing, at which "all parties in interest" shall be given "the right to testify as to any material facts in connection with the proposed use." Then follows the language already referred to, that the Board *"shall* act as a *fact-finding body* and *shall* approve or disapprove the issuance of the permit for the proposed use *in* accordance *with the evidence adduced before it* and *from its own investigation. . . ."* This order of procedure gives the Board the opportunity to inspect the premises prior to the hearing and observe relevant facts at that time. If these facts are considered relevant by the Board to its decision, it should then dictate them into the record at the public hearing so that the parties, their counsel and ultimately the courts on appeal will have a record of such facts and the interested parties and their counsel will have the opportunity to consider those facts and, if thought necessary, to introduce evidence at the hearing to contradict or rebut them. This appears to me to be a fundamental requirement of procedural due process of law and I find that other courts agree with this conclusion.

A case closely in point on this issue in the United States District Court for the District of Columbia is *Hot*

*Shoppes, Inc. v. Clouser*, 231 F. Supp. 825 (1964) *aff'd* 346 F. 2d 834. In this case the District of Columbia Zoning Board of Adjustment, upon its examination of the property in question in connection with whether or not the proposed use constituted an extension of a non-conforming drive-in use, filed an opinion which contained the conclusion that the equipment in question "can be placed somewhere inside the existing structure" so that the "applicant has failed to sustain its burden of proof that a hardship within the meaning of the law does in fact exist." This conclusion of the Board based on its inspection of the property was contrary to all of the evidence before the board on this point. The District Court in holding the board's decision invalid rested its decision upon two grounds, *i.e.*, (1) the District of Columbia Zoning law requiring the board to enter in its docket "all continuances, postponements, dates of sending notices, and other steps taken or acts done by the Board or its officers on behalf of the Board" required the board to set out the *facts* gathered from its inspection of the premises on which the board reached its conclusion and (2) the board by its failure to set forth the facts denied the applicant due process of law. The District Court stated:

> "There is an even graver procedural defect than the Board's failure to set forth the facts upon which it relied in reaching its conclusion that the proposed structure was not required: this is that the inspection of the premises is nowhere set forth in the record except for the mere statement in the order that such inspection took place. Plaintiff did not know that such inspection had taken place, and had no opportunity to question or refute the results of such inspection. In following this procedure, the Board violated two of the requirements of the Zoning Regulations, and deprived plaintiff of due process of law. In the first place, § 8203.7 of the Regulations sets forth the order of procedure at a hearing: first the appellant or applicant states his

side of the case; then any administrative officer states his side of the case; then any interested property owners or other interested persons state their side of the case; and finally appellant has a chance to make a rebuttal. The purpose of this last procedural requirement is to give an applicant the opportunity to rebut just such findings as may have been made as a result of the inspection of plaintiff's property. In the second place, the Secretary of the Board is required, under § 8202.63 of the Regulations, to enter in the docket 'all continuances, postponements, dates of sending notices, and *other steps taken or acts done by the Board* or its officers on behalf of the Board.' Under this Regulation, 'an inspection of the property by the Board' would constitute a 'step taken' or an 'act done,' and would have to be entered in the docket. Exactly how much further due process would go in protecting plaintiff from the kind of arbitrariness demonstrated by the Board is not a question which this Court need resolve at the present time; suffice it to say that the bare minimum, as specified in the Regulations, is that he be permitted to question and rebut any evidence gathered at any such inspection, and that the inspection itself be made a matter of record. *Ex parte* procedures followed by this Board have been so recently the subject of judicial censure as to require no further comment, see Jarrott v. Scrivener, 225 F. Supp. 827 (D.D.C. 1964), except to note the following words of Judge Morris on precisely the point at issue here:

> " 'If there be facts within the expert knowledge of the members of the Board, or acquired by personal inspection of the premises, these should be revealed at the hearing so that opportunity may be afforded to meet them by evidence or argument. There is no room for

arbitrary action or unjust discrimination in
our form of government by any of its agen-
cies. Hyman v. Coe, 102 F. Supp. 254, 257
(1952).'
"Both the Zoning Regulations and the Consti-
tution require just such fair confrontation in an
adversary situation."
(231 F. Supp. at 832-33.)

See also *Robey v. Schwab*, 307 F. 2d 198 (1962 C.A.-
D.C.) and *Jarrott v. Scrivener*, 225 F. Supp. 827 (D.D.C.
1964).

It is clear to me that the Board in the present case in
its order—quoted in full in the majority opinion—sets
out no *facts* which it observed or found as a result of its
examination of the site. It states that the corner of Park
Heights Avenue and Rogers Avenue is "heavily traveled"
and it "would be dangerous at this intersection and [the
car wash] would cause motor vehicles to stand on the
street creating a very hazardous situation." These are
mere conclusions and are contrary to *all* of the facts and
evidence which do appear in the record in this case. As
the majority points out, all of the administrative agen-
cies of the city having responsibility for the various haz-
ards involved and to which the application must be re-
ferred for report, did not indicate that any hazard would
exist if the proposed car wash was established. The De-
partment of Transit and Traffic in its letter of March 27,
1969, to the Director of the Department of Planning
noted that the proposed car wash complied with the statu-
tory requirement of a 10 car storage area and stated
"Since the car wash conforms to existing zoning stan-
dards, we have no objection to this plan." In its report
to the Board, the Department of Transit and Traffic
stated "This Department has no objection to this appli-
cation."

Mr. Holmes, whose testimony is the only testimony be-
fore the Board (there were no protestants), explained the
size and operation of the proposed car wash. It is a coin-

operated car wash, several of which are operated by the applicant on other heavily traveled streets without any resulting traffic congestion or hazard. When asked by the Chairman of the Board what would happen "if you get an overflow of customers?", Mr. Holmes replied "There will be an attendant to direct traffic off the road. To date, we haven't had any overflow at any of our locations." The Chairman then observed that "That is a heavy traffic artery, as you well know," to which Mr. Holmes replied "Most of them are. . . . We are directing the attendant to make sure the road is clear along here." He later observed that the location of an existing comparable car wash at the Ritchie Highway at Church Street had "heavy traffic, too. . .terrific." It was later stated that the proposed car wash would not affect the flow of traffic on Park Heights Avenue and again that the applicant had not had any trouble with its existing car washes to date.

The mere fact that Park Heights Avenue is heavily traveled does not indicate, of itself, that the proposed car wash would create a traffic hazard. Other heavily traveled streets have similar car washes operated by the applicant and no traffic hazard has resulted. The criteria set forth in the zoning ordinance to prevent a traffic hazard has been complied with by the applicant which indeed has "gone the second mile," as it were, to provide an attendant to see to it that there will be no resulting traffic congestion or hazard.

Under these circumstances, in which all of the evidence before the Board at the public hearing indicated that there would be no traffic congestion or hazard, including the report of the city's own Department of Transit and Traffic indicating no objection to the granting of the permit, it was required of the Board that it set forth what *facts* it observed in its inspection of the site upon which it reached the conclusions already mentioned. Otherwise neither the Baltimore City Court nor this Court can ascertain on appeal the factual basis on which the Board acted as a "fact-finding body" and cannot tell whether or not the property rights of the applicant, which seeks to

establish a lawful business, have been protected. Nor did the applicant have an opportunity to challenge or rebut any such "facts" upon which the Board's decision was based.

I find nothing in the prior decision of our predecessors in *Mayor & City Council of Baltimore v. Biermann*, 187 Md. 514, 50 A. 2d 804 (1947), heavily relied on by the majority, which is at all contrary to the requirement that the factual basis for the Board's decision appear in the record. In the *Biermann* case there was ample evidence from "a great many residents" who appeared and testified in that case indicating that the proposed filling station would be a danger and hazard to the children attending a nearby school, some 1,100 in number and ranging in age from 5 to 11. There was also evidence in regard to a fire hazard to the frame residences then in the neighborhood. In *Biermann*, there were ample facts in the record to support the Board's conclusion; in the present case, there are none. The same observations are applicable to *Mayor & City Council of Baltimore v. Muller*, 242 Md. 269, 219 A. 2d 91 (1966) and to *Hoffman v. Mayor & City Council of Baltimore*, 187 Md. 593, 51 A. 2d 269 (1947), also relied on by the majority.

The *dictum* in *Biermann* that, "On this question the property owner has the heavy burden of overcoming the presumption of constitutionality of legislative action, even if the *legislative body* acted *without evidence at all*," (Emphasis supplied.) is correct as applied to action by the *legislative body itself*, but has no application to the action by the Board under a *delegated* legislative power which requires the Board to act as a "fact-finding body" and to base its decision upon the evidence adduced before it at the hearing and upon its own investigation. The legislative body, itself, would not be bound by these requirements imposed by it on the Board; the Board is so bound.

In the light of the provisions of the Zoning Ordinance, itself, of the constitutional requirements involved, and the decisions and authorities already mentioned, requiring the Board to set forth the facts observed in its in-

spection of the site upon which it reached its conclusions, I would reverse.