DEPARTMENT OF NATURAL RESOURCES
*v.* LINCHESTER SAND AND
GRAVEL CORPORATION

[No. 80, September Term, 1974.]

*Decided March 19, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Warren K. Rich, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Henry R. Lord, Deputy Attorney General,* on the brief, for appellant.

*Thomas S. Simpkins,* with whom was *Thomas J. Spain* on the brief, for appellee.

DIGGES, J., delivered the opinion of the Court.

Maryland's recently enacted "wetlands statute," marshalled by the General Assembly to protect those vast acres of ecologically, economically, aesthetically and recreationally valuable terraqueous areas having completely, partially or periodically submerged bottoms, which are the habitats of innumerable variations of aquatic life, is the legal quagmire through which we must wade in order to resolve this dispute.[1] Although the basic legal question requires considerable analysis, the facts of this case are not muddled.

---

1. At the time this litigation was instituted the "wetlands statute" was set forth in the Maryland Code (1957, 1970 Repl. Vol.), Art. 66C, §§ 718-731. It has been recodified and now appears in the Maryland Code (1974), Title 9 of the Natural Resources Article. The citations in this opinion will reflect the 1974 codification. For historical background and general discussion of this legislation see Comment, *Maryland Wetlands: The Legal Quagmire,* 30 Md.L.Rev. 240 (1970).

Approximately four years ago Linchester Sand and Gravel Corporation, the appellee, purchased five acres of land, located in Somerset County and bounded on two sides by the Wicomico River and its tributary, the Dames Quarter Creek, so that the owner of that corporation, William C. Sharpley, could build two summer homes on the property — one for himself and one for his son. Approximately half of this purchase is composed of wetlands, since it becomes inundated by spring tides.[2] As a consequence, Sharpley, apparently unaware of the necessity of obtaining beforehand a permit as required by Maryland Code (1974), § 9-306 (a) of the Natural Resources Article, set about the task of altering the wetlands portion of the property to make it more suitable for home construction and access to the beach. To accomplish this Sharpley began to dredge the marsh and use the borrow obtained as fill for a man-made dune. In the process of doing this he created a cut into his private wetland which resulted in the despoliation of a considerable portion of both his and the adjoining public marsh. The appellant, the Department of Natural Resources, describes the destructive nature of Sharpley's activities by asserting that:

---

**2.** A spring tide is one which is greater than average, occurring at or shortly after the new or full moon when the tidal actions of sun and moon are nearly in the same aligned direction.

It is conceded that the land which is the subject of this litigation is private wetlands as compared to state wetlands. These terms are defined in § 9-101 of the Natural Resources Article, as follows:

"(j) *'Private wetlands'* means any land not considered 'state wetland' bordering on or lying beneath tidal waters, which is subject to regular or periodic tidal action and supports aquatic growth. This includes wetlands, transferred by the state by a valid grant, lease, patent, or grant confirmed by Article 5 of the Declaration of Rights of the Constitution, to the extent of the interest transferred.

\* \* \*

"(m) *'State wetlands'* means any land under the navigable waters of the state below the mean high tide, affected by the regular rise and fall of the tide. Wetlands of this category which have been transferred by the state by valid grant, lease, patent or grant confirmed by Article 5 of the Declaration of Rights of the Constitution shall be considered 'private wetland' to the extent of the interest transferred."

"The effect of the unauthorized placement of fill on the marsh area destroyed an area 40 feet by approximately 150 feet of tidal State wetlands. The larger impact, however, of this fill was to prevent the flooding of the marshland by blocking off the marsh and thereby allow water to become impounded within the marsh, cutting off the free flow of water thereupon. Part of the marsh therefore has already died with the probable enlargement of a mosquito problem."

When these dredging and filling activities came to the attention of the department it issued a "cease and desist order" which commanded the landowner to terminate this topographical alteration until he obtained a proper permit as is required by § 9-306. In an effort to comply with this mandate, Sharpley submitted his application, which, following departmental study, was denied by the Secretary of the Department of Natural Resources on April 10, 1973. Undeterred by what he considered to be an unreasonable action by the Secretary, Sharpley appealed to the department's board of review as is permitted by § 9-307. However, his hopes to obtain the permit through this source were also dashed when, on October 1, 1973, the board affirmed the Secretary's decision.

Having been rebuffed in his efforts to obtain a permit through these administrative processes, Sharpley then turned to the judicial branch of this State's government for relief by appealing the departmental denial of his permit to the Circuit Court for Somerset County (Duer, C. J.), where he sought a de novo trial by jury under the provisions of § 9-308. That section of the "wetlands statute" states:

"(a) *Appeal procedure; time limitation.* — Any party to the appeal to the board of review pursuant to § 9-307 may appeal to the circuit court for the county in which the land is located within 30 days after the decision of the board of review.

(b) *Appeal not subject to Administrative Procedure Act; de novo trial; election of jury trial;*

*no right of removal.* — The appeal is not subject to the provisions of the Administrative Procedure Act. The court shall hear the case de novo. Either party may elect a jury trial. There is no right of removal.

(c) *Court may set aside or modify decision if unreasonable exercise of police power.* — If the court finds that the decision of the board of review appealed from is an unreasonable exercise of police power, it may set aside or modify the determination."

At the jury trial which followed this request, Judge Duer, while deciding as a matter of law that "reasonable preservation of a natural resource is a valid exercise of police powers," nevertheless, permitted the jury to determine the ultimate question of whether the permit in this case should be granted. Aside from informing the jury of its general duties and upon whom the burden of proof rests, the court's instructions consisted almost exclusively of a verbatim reading of the following excerpted language from § 9-306 (b) and (c) and § 9-102 of the "wetlands statute":

"Now, it says this: 'In granting, denying, or limiting any permit, the secretary,' meaning the secretary of the Board of Natural Resources, 'or his duly designated hearing officer shall consider the effect of the proposed work with reference to the public health and welfare, marine fisheries, shellfisheries, wildlife, economic benefits, the protection of life and property from flood, hurricane and other natural disasters, and the public policy set forth in this subtitle. In granting a permit, the secretary may limit or impose conditions or limitations designed to carry out the public policy set forth in this subtitle. Upon receipt of an application for a permit pursuant to this section, the secretary or his designee,' meaning one that he would designate to act for him in his stead, 'shall hold a public hearing on the matter within 60 days after receipt of the application. A decision

shall be made by the secretary within 30 days after the hearing. Failure to act in conformance with either of these requirements shall constitute automatic approval of the application for permit as stated.'

"Now, ladies and gentlemen, in the start of the Wetlands Acts, this is Declaration of Public Policy, 'It is declared that in many areas of the State, much of the wetlands have been lost or despoiled by unregulated dredging, dumping, filling, and like activities, and that the remaining wetlands of this State are in jeopardy of being lost or despoiled by these and other activities; that such loss or despoliation will adversely affect, if not entirely eliminate, the value of such wetlands as a source of nutrients to finfish, crustacea and shellfish of significant economic value; that such loss or despoliation will destroy such wetlands as habitats for plants and animals of significant economic value and will eliminate or substantially reduce marine commerce, recreation, and aesthetic enjoyment; and that such loss or despoliation will, in most cases, disturb the natural ability of tidal wetlands to reduce flood damage and adversely affect the public health and welfare; that such loss or despoliation will substantially reduce the capacity of such wetlands to absorb silt and will thus result in increased silting of channels and harbor areas to the detriment of free navigation. Therefore, it is declared to be the public policy of this State, taking into account varying ecological, economic, developmental, recreational and aesthetic values, to preserve the wetlands and to prevent the despoliation and destruction thereof.' " [3]

---

3. Sharpley's counsel informed the trial judge that he took no exception to any of the court's instructions.

The jury answered the following issue which the court submitted to it — "After weighing the facts, considering the testimony and applying the law as given to you by the court, should the requested permit be granted or denied? " — by responding, "Granted." Accordingly, judgment was entered in favor of the appellee.

After Sharpley's trial court victory, the Department of Natural Resources appealed to this Court, asserting that this type of extensive and nullifying judicial de novo review, under § 9-308 (b), is not permitted by the Maryland Constitution because "the judicial branch of government may not usurp the province of the administrative prerogative." We agree with the appellant, and, therefore, will reverse the judgment entered in the circuit court.[4]

Taken literally the language of § 9-308 (b) seems to sustain the conclusion reached by the circuit court that a landowner who is not content with the Department of Natural Resources' conclusion concerning his use of his own wetlands can appeal to the judicial branch of government and in doing so have the slate cleansed to the extent that the court, or the jury if opted for, can completely substitute its own judgment for that of the administrative agency without regard to that agency's prior determination. The appellant does not argue that the words should be given a meaning at variance with this; instead, it contends that such a scope of judicial review, built into the "wetlands statute," is

---

4. The appellant also raised the following four issues:

"The court below erred in excluding a question on voir dire directed to a specific cause for disqualification — the ownership of wetlands.

"Appellee has not sustained his burden of showing that the decision appealed from was an unreasonable exercise of the police power.

"The scope of de novo review in this case is limited by statute [(§ 9-308 (c))] to the determination of whether the action of the administrative body reflected a proper exercise of police power.

"Use of the terms 'significant' or 'substantial' in the context of this case both through admission of evidence and instructions to the jury was erroneous."

However, because of the manner of our disposition on the constitutional issue, it becomes unnecessary for us to reach these additional issues.

unconstitutional, as being "a usurpation of the traditional division of powers between the legislative and judicial branches" of this State's government.

In assessing the constitutionality of an act of the General Assembly we are mindful of the fact that enactments of the Legislature are presumed to be constitutionally valid and that this presumption prevails until it appears that the enactment under consideration is invalid or obnoxious to the expressed terms of the Constitution or to the necessary implication afforded by, or flowing from, such expressed provisions. *Md. Bd. of Pharmacy v. Sav-A-Lot*, 270 Md. 103, 106-07, 311 A. 2d 242 (1973); *Salisbury Beauty Schools v. St. Bd.*, 268 Md. 32, 48-49, 300 A. 2d 367 (1973).

That aspect of the Constitution which is spotlighted by this case is the fundamental doctrine of separation of powers, a principle expressly or impliedly recognized in the basic law of every state in this nation. This doctrine has long been a cornerstone of this State's concept of government and finds forthright expression in Article 8 of the Declaration of Rights contained in the Constitution of Maryland in these words:

> "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

Although Maryland's statement of the separation of powers is "a more concrete barrier than any which the Supreme Court has had to hurdle under the Federal Constitution," R. Oppenheimer, *Administrative Law in Maryland*, 2 Md.L.Rev. 185, 188 (1938), the right of the Legislature to delegate powers to administrative agencies has been recognized in this State for more than 125 years. *Harrison v. Mayor & C. C. of Balt.*, 1 Gill 264 (1843).

As a result of the fact that delegation by the Legislature of some of its own power is permissible, there has been a devolution of a great variety of nonjudicial responsibilities and functions to administrative agencies, which, after being

provided with general rules and standards to guide them, are given "the task of acquiring information, working out the details, and applying these rules and standards to specific cases." *Tighe v. Osborne*, 150 Md. 452, 463, 133 A. 465 (1926). Though expressed in a dissenting opinion, we believe to be correct what Chief Judge Bond succinctly pointed out exactly fifty years ago in *Goldman v. Crowther*, 147 Md. 282, 320-22, 128 A. 50 (1925):

"Legislation which has to provide for a large number of special cases of varied facts, or for unforeseeable conditions present or future, must be supplemented by the action of administrative officers with power to adapt and vary the rule as the special cases come before them, one by one. If this were not permissible, then the legislative branch of the government could not deal with some of the needs of the country or of the community at all, for it can be done in no other way. . . . Senator Elihu Root, who speaks with the authority of a most profound understanding of our institutions and of the law, said to the American Bar Association in 1916: 'As any community passes from simple to complex conditions the only way in which government can deal with the increased burdens thrown upon it is by the delegation of power to be exercised in detail by subordinate agents, subject to the control of general directions prescribed by superior authority. The necessities of our situation have already led to an extensive employment of that method. The Interstate Commerce Commission, the State Public Service Commissions, the Federal Trade Commission, the powers of the Federal Reserve Board, the health departments of the states, and many other supervisory offices and agencies are familiar illustrations. Before these agencies the old doctrine prohibiting the delegation of legislative power has virtually retired from the field and given up the

> fight. There will be no withdrawal from these experiments. We shall go on; we shall expand them, whether we approve theoretically or not, because such agencies furnish protection to rights and obstacles to wrongdoing which under our social and industrial conditions cannot be practically accomplished by the old and simple procedure of legislatures and courts as in the last generation.' "

These remarks were indeed prophetic, as, over the many years since they were spoken, administrative agencies have prospered and multiplied prolifically.

In response to the practical needs of government, not only has there been an extensive introduction of these administrative agencies in this State, as is true in most if not all of our sister states, but in addition, as a consequence of this need, there has occurred within these agencies some mingling, blending and overlapping of the legislative, executive and judicial functions. We believe this to be permissible, within limits, as the separation of powers concept may constitutionally encompass a sensible degree of elasticity and should not be applied with doctrinaire rigor.

However, this constitutional "elasticity" cannot be stretched to a point where, in effect, there no longer exists a separation of governmental power, as the Maryland Constitution does not permit a merger of the three branches of our State government, nor does it "make any one of the three departments subordinate to the other, when exercising the trust committed to it." *Painter v. Mattfeldt*, 119 Md. 466, 472, 87 A. 413 (1913). When the Legislature confers, by enactment, powers upon one of the other branches of government which are beyond those permitted under the Constitution, or any of the three branches of government takes unto itself powers denied to it or those strictly within the sovereignty of another branch, the courts of this State must step in and declare such encroachments to be constitutionally prohibited, not because the court is a "Triton among minnows" or predominates in dignity, but because, as Chief Justice Marshall, in *Marbury v. Madison*, 1

Cranch 137 (1803), in speaking of the federal constitutional system — though just as applicable to our State system — avowed:

> "It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.

> "So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty.

> "If, then, the courts are to regard the constitution, and the constitution is superior to any ordinary act of the legislature, the constitution, and not such ordinary act, must govern the case to which they both apply." *Id.* at 177-78.

When faced with the responsibility of juxtaposing a statute which provides for judicial review of administrative agencies with the separation of powers doctrine as it is enshrined in the Maryland Constitution, it is clear that the analysis involves contrasting the relative role of the administrative agency process with that of the judiciary. We note initially that both the agencies and the courts are governmental ministries created to promote public purposes, and in this sense they are collaborative instrumentalities, rather than rivals or competitors, in the paramount task of safeguarding the interests of our citizens. However, the agencies and the courts each have their own, separate, constitutionally-erected fortress of power and responsibility in the relationship each has to the activities delegated by the Legislature to administrative agencies.

The primary function of administrative agencies is to advance the will and weal of the people as ordained by their representatives — the Legislature. These agencies are created in order to perform activities which the Legislature deems desirable and necessary to forward the health, safety, welfare and morals of the citizens of this State. While these agencies at times perform some activities which are legislative in nature and thus have been dubbed as quasi-legislative duties, they in addition take on a judicial coloring in that frequently, within the exercise of their power, they are called upon to make factual determinations and thus adjudicate, and it is in that sense that they are also recurrently considered to be acting in a quasi-judicial capacity. This dual role which administrative agencies play has long been accepted in this State as being constitutionally permissible. *Zeitschel v. Bd. of Ed. of Carroll Co.*, 274 Md. 69, 332 A. 2d 906 (1975); *County Council v. Investors Funding*, 270 Md. 403, 312 A. 2d 225 (1973); *Heaps v. Cobb*, 185 Md. 372, 45 A. 2d 73 (1945); *Hecht v. Crook*, 184 Md. 271, 40 A. 2d 673 (1945). However, this authority is not the same and, therefore, is distinguishable from the exercising of the "judicial powers" of this State, which power by Section 1, Article IV of the Maryland Constitution is reserved exclusively to designated courts in these explicit words:

"The Judicial power of this State shall be vested in a Court of Appeals, and such intermediate courts of appeal, as shall be provided by law by the General Assembly, Circuit Courts, Orphans' Courts, such Courts for the City of Baltimore, as are hereinafter provided for, and a District Court . . . ."

This distinction between an administrative agency's fact-finding function and the exercise of the State's judicial power by courts under the Constitution was definitively pointed out by Chief Judge Sloan when, in speaking for this Court in *Dal Maso v. County Commrs.*, 182 Md. 200, 205, 34 A. 2d 464 (1943), he said:

"There is some confusion as to the nature and

character of these administrative boards, and there are many opinions and text writers who refer to them as quasi-judicial. They do hear facts and, based on them, make decisions, but those decisions are not judgments or decrees. If their findings, resolutions, or orders are resisted or ignored, they must call on the courts to enforce them. Administrative boards and officials are arms and instrumentalities of the Legislature, and are not judicial at all; they belong to and derive all their authority from the legislative branch under our form of government. In this State, all judicial authority is only such as is provided for by Article 4 of the Maryland Constitution, and it has been decided that only judicial functions can be exercised which find their authority in that Article . . ., and that no court not coming within its provisions can be established in this State."

See also *Heaps v. Cobb, supra; Woelfel v. State,* 177 Md. 494, 501, 9 A. 2d 826 (1939); *Hagerstown v. Dechert,* 32 Md. 369 (1870).

While administrative agencies, in the proper performance of duties which the Legislature permissibly delegates to them, may use discretion to formulate policy, promulgate rules and adjudicate in order to determine specific questions of fact, they, nevertheless, in doing so are performing nonjudicial functions; on the other hand, the role of the courts in regard to these administrative agency functions is to see that these responsibilities were properly empowered to the agency and have been performed within the confines of the traditional standards of procedural and substantive fair play. In order to perform this essential duty, the courts may be provided with specific authorization to do so by the Legislature through statutory provision, but, even absent such authority, the judiciary has an undeniable constitutionally-inherent power to review, within limits, the decisions of these administrative agencies. *Balto. Import Car v. Md. Port Auth.,* 258 Md. 335, 265 A. 2d 866 (1970);

*Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 236 A. 2d 282 (1967); *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 84 A. 2d 847 (1951); *Heath v. M. & C. C. of Baltimore,* 187 Md. 296, 304-05, 49 A. 2d 799 (1946). This power of review, whether authorized by statute or assumed inherently, cannot be a substitution of the court's judgment for that of the agency. In those instances where an administrative agency is acting in a manner which may be considered legislative in nature (quasi-legislative), the judiciary's scope of review of that particular action is limited to assessing whether the agency was acting within its legal boundaries (not an issue here); furthermore, when an agency is acting in a fact-finding capacity (quasi-judicial) the courts review the appealed conclusions by determining whether the contested decision was rendered in an illegal, arbitrary, capricious, oppressive or fraudulent manner. *Storch v. Zoning Bd. of Howard Co.,* 267 Md. 476, 487 (including footnote 2), 298 A. 2d 8 (1972); *Crown Central v. City of Baltimore,* 258 Md. 82, 89, 265 A. 2d 192 (1970); *M. & C. C. of Balto. v. Biermann,* 187 Md. 514, 523, 50 A. 2d 804 (1947); see also *Balto. Import Car v. Md. Port Auth.,* 258 Md. 335, 342, 265 A. 2d 866 (1970). This latter type of review has been consistently and just recently sustained by this Court in appeals from various types of administrative agencies, including, *e.g.,* District Council in zoning cases, *Northampton v. Pr. George's Co.,* 273 Md. 93, 327 A. 2d 774 (1974); Tax Court in property assessment cases, *Dickinson-Tidewater, Inc. v. Supervisor of Assess.,* 273 Md. 245, 329 A. 2d 18 (1974); and Public Service Commission in rate-making cases, *Public Serv. Comm'n of Md. v. Balt. Gas & Elec. Co.,* 273 Md. 357, 329 A. 2d 691 (1974). This latter type of review has been characterized in varying ways, but as Chief Judge Hammond noted for this Court in *Insurance Comm'r v. Nat'l Bureau,* 248 Md. 292, 236 A. 2d 282 (1967): [5]

---

**5.** It is at least partly due to these various descriptions of the same standard of review that the Administrative Procedure Act Maryland Code (1957, 1971 Repl. Vol.) Art. 41, §§ 244-256, was developed. It is designed to apply to all State agencies except those expressly excluded, Kaufman v. Taxicab Bureau, 236 Md. 476, 204 A. 2d 521 (1964), *cert. denied,* 382 U. S. 849 (1965).

"Whichever of the recognized tests the court uses — [whether it be the arbitrary, capricious, unreasonable or illegal standard (*Balto. Import Car v. Md. Port Auth., supra* at 342), or the tests of] substantiality of the evidence on the record as a whole, clearly erroneous, fairly debatable or against the weight or preponderance of the evidence on the entire record — its appraisal or evaluation must be of the agency's fact-finding results and not an independent original estimate of or decision on the evidence. The required process is difficult to precisely articulate but *it is plain that it requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions* under any of the tests, all of which are similar. There are differences but they are slight and under any of the standards the judicial review essentially should be limited to whether a reasoning mind reasonably could have reached the factual conclusion the agency reached. This need not and *must not be either judicial fact-finding or a substitution of judicial judgment for agency judgment.*" *Id.* at 309-10 (emphasis added).

With whatever terminology this scope of review is defined, it has equal application to the judicial review of an agency's decision whether there is absent statutory provision for review, *Balto. Import Car v. Md. Port Auth., supra* at 342, or whether a statute specifically grants the courts a right of review. However, just as the administrative agency has constitutional limitations to its power vis-a-vis the courts, so do the courts have constitutional restrictions limiting their oversight of agency decisions. This follows from the fact that the judiciary is constitutionally "without authority to interfere with any [proper] exercise of the legislative prerogative . . . or with the lawful exercise of administrative authority or discretion." *Heaps v. Cobb, supra* at 379. This limitation is articulated in *Insurance Comm'r v. Nat'l Bureau, supra* at 310, where it is said:

> "We hold that a court in reviewing legislative actions or decisions of an administrative agency may apply the weight of the evidence test to the factual findings of the agency, *without exercising nonjudicial functions, provided it does not itself make independent findings of fact or substitute its judgment for that of the agency.*" (emphasis added).

This same proposition finds support in Professor Davis' treatise, where he says, "The basic proposition that a constitutional court should not be required to perform nonjudicial functions is probably beyond challenge." 4 Davis, *Administrative Law Treatise,* § 29.10 (1958). Because courts cannot be required to exercise nonjudicial duties it has been held by this Court that it is beyond the power of the Legislature to require the judiciary to: approve accounts of county officers before payment, *Robey v. Prince George's County,* 92 Md. 150, 48 A. 48 (1900); perform duties tantamount to a board of review in assessing property for tax purposes, *Baltimore City v. Bonaparte,* 93 Md. 156, 48 A. 735 (1901); appoint a board of visitors to supervise the county jail, *Beasley v. Ridout,* 94 Md. 641, 52 A. 61 (1902); provide for referendum concerning issuance of liquor licenses, *Board of Supervisors v. Todd,* 97 Md. 247, 54 A. 963 (1903); issue licenses permitting pari-mutuel betting on horse races, *Close v. Southern Md. Agr. Asso.,* 134 Md. 629, 108 A. 209 (1919); and issue liquor licenses, *Cromwell v. Jackson,* 188 Md. 8, 52 A. 2d 79 (1947). Thus, in regard to administrative agencies, which, while often functioning as fact-finding bodies, perform essentially nonjudicial duties, a Maryland court's "inquiry is [almost always] limited to finding whether there was illegality or unreasonableness in the . . . action — when that inquiry is finished, judicial scrutiny ends . . . ." *Balto. Gas Co. v. McQuaid,* 220 Md. 373, 382, 152 A. 2d 825 (1959).

However, it is recognized that in very rare instances there can be created administrative agencies whose functions are subject, as authorized by the Legislature, to a broader scope

of judicial review. This type of agency is a hybrid in that its basic function is so essentially judicial that it can be considered to be supplanting what might have been a court function, albeit in a constitutional sense its activity is legislative in nature because it is "part of the *police power*, as contradistinguished from the regular judiciary powers of the State." *Solvuca v. Ryan & Reilly Co.*, 131 Md. 265, 283, 101 A. 710 (1917). This was pointed out in *Dorman v. Mayor & C. C. of Balto.*, 187 Md. 678, 51 A. 2d 658 (1947), where Judge Markell, speaking for this Court, said

> "Beyond the minimum inherent judicial power of review of administrative action, the extent of judicial review *in particular classes of cases* depends upon the legislature. Such review may extend to trial de novo, on the law and the facts, as in workmen's compensation cases." *Id.* at 688 (emphasis added).

Indeed, the Workmen's Compensation Commission is a perfect, and may be at present the singular, example of Judge Markell's "particular classes of cases." It falls into this category, at least in part, because its activities are in substitution for traditional common law rights and procedures while at the same time it functions to establish a remedy otherwise the subject of a tort action. See *Branch v. Indemnity Ins. Co.*, 156 Md. 482, 485-86, 144 A. 696 (1929); *Mattare v. Cunningham*, 148 Md. 309, 314, 129 A. 654 (1925); 4 Davis, *Administrative Law Treatise*, § 29.10 (1958). As a result, this agency's activities have been subject to a considerably more expansive type of judicial review which has been unchallenged for more than half a century.

The agency now before us, the Department of Natural Resources, does not present a twilight situation such as does the Workmen's Compensation Commission. It is clear that whether, under Title 9 of the Natural Resources Article, a particular parcel of land comes within the statutory wetlands designation and, if so, whether it must remain in its then existing natural state for ecological, aesthetic,

environmental and recreational reasons are decisions to be made pursuant to the State's police power. Consequently, departmental activities must be exercised within the guidelines and standards prescribed by the Legislature; thus circumscribed, when granting or denying a permit in a specific case, the Secretary and the board of review gather and sift evidence which is directed both at present and future repercussions so as to take into account the needs of the public in general. In this regard the decisions and the activities of this agency are not dissimilar from those of zoning councils, the tax court, or the Public Service Commission, all of whose actions we determined can be reviewed by the judiciary only under an "arbitrary and capricious" type of scrutiny. *Northampton v. Pr. George's Co.; Dickinson-Tidewater, Inc. v. Supervisor of Assess.; Public Serv. Comm'n of Md. v. Balt. Gas & Elec. Co.,* all *supra.*

It was not competent, therefore, for the court to empanel a jury and then in effect instruct it to convert itself into an administrative body with authority, as if original, to grant or deny a permit and in doing so determine whether there was or potentially could be a deleterious effect, as contemplated by the "wetlands statute," if Sharpley dredged and filled as he desired. This the Maryland Constitution, which divides the powers of government into three separate branches, neither to usurp the authority of the other, steps forth and forbids. On appeal, § 9-308 (b) notwithstanding, the circuit court is constitutionally limited to an assessment of whether that determination was based on evidence sufficiently substantial so that the permit denial was not "arbitrary and capricious." In this connection, we cannot refrain from observing that a practice which would permit judges or jurors to substitute, on a de novo basis, their discretion for that of the department's experts, would place this State in the intolerable situation of having as many wetland decision-makers as there are circuit court judges and juries empaneled for this purpose. If this were to be the case, the result would be a destruction of the effectiveness of the department in conserving, for the general public good,

the valuable wetlands of this State, and reduce this agency's power, in this field, as a practical matter, to a nullity.

We, accordingly, hold that the entire subparagraph (b) of section 9-308 of the Natural Resources Article, which in substance provides for a de novo trial free of the Administrative Procedure Act, with the right of electing to have a jury trial and with no right of removal, is void as being unconstitutional.[6] The finding that this provision is void in no way affects the validity of the remaining portions of the statute. See the general "severability of provisions of statutes" enactment, set out in Code (1957, 1968 Repl. Vol., 1974 Cum. Supp.), Art. 1, § 23.

Since the record upon which the Secretary and the review board based their decisions is not before us, and may well not have been before the circuit court, we will vacate that court's judgment and remand this case for the purpose of a review by the circuit court limited in scope as is indicated by this opinion. In directing further proceedings we necessarily reject the appellee's contention that, since the property which is the subject of this litigation has already been dredged and filled to a significant degree, this dispute is now moot, because, assuming the department's permit denial is ultimately sustained, restoration to the extent reasonably possible can be required under § 9-501 (d), if the requirements of that section are met, or perhaps otherwise.

> *Judgment of the Circuit Court for Somerset County vacated.*
> *Case remanded for further proceedings to be conducted in accordance with this opinion.*
> *Costs to be paid by the appellee.*

---

**6.** It would seem that § 9-305 (b), providing for an appeal, in the identical language of § 9-308 (b), from the administrative rules and regulations decisions by the Secretary and review board, likewise would be constitutionally invalid for the same reason.