REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 752

September Term, 2014

_____

RELIABLE CONTRACTING
COMPANY, INC.

v.

MARYLAND UNDERGROUND
FACILITIES DAMAGE PREVENTION
AUTHORITY

_____

Graeff,
Arthur,
Leahy,

JJ.

_____

Opinion by Graeff, J.
Concurring Opinion by Arthur, J.

_____

Filed: April 30, 2015

Meredith, J. and Friedman, J. did not
participate in the argument or the decision in
this case.

In this appeal, Reliable Contracting Company, Inc. ("Reliable"), appellant, challenges the constitutionality of Md. Code (2010 Repl. Vol.) § 12-135 of the Public Utilities Article ("PU"). Pursuant to PU § 12-135, the Maryland Underground Facilities Damage Prevention Authority (the "Authority"), appellee, has the power to issue citations and impose penalties for violations of the statutory provisions regarding underground facilities (the "Miss Utility statute").

The case arises from a citation issued by the Authority to Reliable regarding allegations that Reliable failed, as required by statute, PU § 12-124, to contact the Miss Utility "one-call system" to receive clearance prior to performing an underground excavation. Following a hearing, the Authority assessed a fine of $2,000 for Reliable's violation of PU § 12-124, and a fine of $1,000 for Reliable's violation of another statutory provision, the latter of which could be purged if Reliable completed damage prevention training. Reliable sought judicial review in the Circuit Court for Anne Arundel County, which affirmed the Authority's decision.

On appeal, Reliable raises the following questions for our review:

1. Does [PU] § 12-135 violate Art. IV of the Maryland Constitution and/or Art. 24 of the Maryland Declaration of Rights in vesting plenary judicial power in the [Authority] to issue citations and adjudicate all cases involving violations of the Miss Utility statute?[1]

---

[1] MD. CONST. Art. IV provides that the "[j]udicial power of this State is vested in" the courts of this state, and it provides the qualifications that judges must possess. MD. DECL. RIGHTS, Art. 24 provides: "That no man ought to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land."

2. Does [PU] § 12-135 violate Art. IV of the Maryland Constitution and/or Art. 24 of the Maryland Declaration of Rights in vesting the [Authority with] unrestricted, unbridled discretion in fixing the amount of penalty, within broad limits, up the $2,000.00 for a first offense and up to $4,000.00 for a subsequent offense, without any legislative safeguards or standards?

For the reasons that follow, we answer these questions in the negative, and therefore, we shall affirm the judgment of the circuit court.

## STATUTORY BACKGROUND

The Miss Utility statute, as first enacted in Md. Code (1957) Art. 78 § 28A(b), required that all owners of underground facilities in the state—i.e., public utilities, telecommunications corporations, cable television corporations, political subdivisions, municipal corporations, steam heating companies, and authorities—become "owner-members" of a "one-call" system. *See* S.B. 911, Fiscal Note (Mar. 10, 2010). To prevent negligent damage to an underground facility, "a person could not begin an excavation or demolition unless all underground facilities in the vicinity of the planned excavation or demolition had been marked or the person had received notice from each owner or the one-call system that marking was unnecessary." *Id.* A person was required to "notify the one-call system, by telephone, of a planned excavation or demolition" prior to starting an excavation or demolition. *Id.*

In 2006, the federal government enacted the Pipeline Inspection, Protection, Enforcement, and Safety Act of 2006 (the "PIPES Act"). 49 U.S.C. § 60134. The PIPES Act gave the U.S. Secretary of Transportation authority to give federal grants to a "State authority" "to assist in improving the overall quality and effectiveness of a damage

2

prevention program." 49 U.S.C. § 60134(a). A damage prevention program was required to contain several elements, including: (1) "[a] process for resolving disputes that defines the State authority's role as a partner and facilitator to resolve issues"; and (2) an enforcement process, "including public education, and the use of civil penalties for violations assessable by the appropriate State authority." 49 U.S.C. § 60134(b)(6), (7).

In 2010, the Maryland General Assembly revised the Miss Utility statute to increase the opportunities to obtain grants pursuant to the PIPES Act. 2010 Md. Laws, ch. 635; Letter from Douglas F. Gansler, Attorney General of Maryland, to The Honorable Martin O'Malley, Governor of Maryland (May 12, 2010) (on file at http://perma.cc/SVR7-79ME). The revised Miss Utility statute was codified in PU § 12-101, *et seq.*, and one of the changes was to establish the Authority. The legislative intent was specifically set forth in the statutory scheme:

> It is the intent of the General Assembly to protect underground facilities of owners from destruction, damage, or dislocation to prevent:
> (1) death or injury to individuals;
> (2) property damage to private and public property; and
> (3) the loss of services provided to the general public.

PU § 12-202.

The Miss Utility statute set forth procedures that were required for excavation or demolition. As relevant here, a person intending to perform an excavation or demolition is required to call Miss Utility's one-call system to indicate the location of the proposed excavation or demolition and the type of work to be performed. PU § 12-124. Excavation or demolition may begin only after notification from the one-call system confirming that

3

all applicable owner-members have marked their underground facilities or reported that they have no underground facilities in the vicinity.  PU § 12-127(a)(1)-(3).

PU § 12-135, the statute at issue here, sets forth the potential consequences for a violation of the Miss Utility statute.  It provides as follows:

> (a) *In general.* — (1) A person that performs an excavation or demolition without first providing the notice required under § 12-124(a) of this subtitle and damages, dislocates, or disturbs an underground facility is deemed negligent and is subject to a civil penalty assessed by the Authority not exceeding:
> > (i) $2,000 for the first offense; and
> > (ii) subject to subsection (c) of this section, $4,000 for each subsequent offense.
> 
> (2) Instead of or in addition to a civil penalty assessed under this subsection, the Authority may:
> > (i) require that a person:
> > > 1. participate in damage prevention training; or
> > > 2. implement procedures to mitigate the likelihood of damage to underground facilities; or
> > (ii) impose other similar measures.
> 
> (3) A person that violates any provision of Part IV of this subtitle is subject to a civil penalty assessed by the Authority not exceeding $2,000.
> 
> (b) *Action to recover.* — (1) This subsection applies if a proceeding has not been initiated before the Authority.
> 
> (2) A court of competent jurisdiction may assess a civil penalty of up to 10 times the cost of repairs to the underground facility caused by the damage, dislocation, or disturbance against a person that has committed a subsequent offense under subsection (a)(1) of this section.
> 
> (3) An action to recover a civil penalty under this subsection shall be brought by an owner of a damaged, dislocated, or disturbed underground facility or the Attorney General in a court of competent jurisdiction in Baltimore City or the county in which the damage, dislocation, or disturbance occurred.
> 
> (4) The party bringing an action under this subsection may recover reasonable attorney's fees.
> 
> (c) *When penalty assessment prohibited.* — The Authority may not assess a civil penalty under subsection (a)(1)(ii) of this section if an action to recover a civil penalty has been brought under subsection (b) of this section.

4

(d) *Disposition of funds.* — All civil penalties recovered under this section shall be paid into the Fund.[2]

The Authority may not assess a penalty against a person unless the person is given reasonable notice of the complaint and an opportunity to be heard. PU § 12-112(c). At a hearing for an alleged violation of the Miss Utility statute, all testimony must be given under oath, and the proceeding must be recorded. PU § 12-113(a). The Authority's decision must be issued in writing, and it must state the reason for its decision. PU § 12-113(d). A person aggrieved by a decision of the Authority may request judicial review of the decision by the circuit court. PU § 12-113(e)(1) (in "accordance with the judicial review and appeals process under the Administrative Procedure Act, the circuit court shall hear and determine all matters connected with the decision of the Authority for which judicial review is requested").

## FACTUAL AND PROCEDURAL BACKGROUND

On February 12, 2013, Washington Gas filed a Notice of Probable Violation with the Authority. It named Reliable as the contractor who allegedly violated PU § 12-124(a), by failing to call Miss Utility's one-call system prior to excavating in Bowie, and PU § 12-127(e), by disregarding clear evidence that underground facilities were present at that location. On April 16, 2013, after the Authority researched the allegations, it notified

---

[2] There is a "Maryland Underground Facilities Damage Prevention Education and Outreach Fund," the purpose of which is to cover the costs of "public education and outreach programs" and the "development of safety procedures to prevent damage to underground facilities." Md. Code (2010 Repl. Vol.) § 12-117(a)(b)(1)-(2) of the Public Utilities Article ("PU").

5

Reliable by letter of its conclusion that Reliable did violate those statutory provisions. The Authority also advised Reliable that a fine of $2,000 would be assessed for the violation of PU § 12-124(a), as well as a fine of $1,000 for the violation of PU § 12-127(e). The Authority indicated that the latter fine would be waived if Reliable participated in damage prevention training.

The notification also informed Reliable that it had the right to a hearing, where the Authority would review all facts asserted in the Notice of Probable Violation before taking any final action regarding fines and/or damage prevention training. Reliable had the option to schedule a hearing or waive its "right to a hearing and accept the proposed fines/or damage prevention training." The notice advised that, if Reliable opted to have a hearing, witnesses could appear and testify under oath regarding any information pertinent to the Notice of Probable Violation. After the hearing, the Authority would issue a written decision, and if Reliable disagreed with that decision, it could request judicial review in the circuit court.

On May 2, 2013, Reliable submitted a request for a hearing, and on September 11, 2013, the Authority held a hearing. The only person who appeared on behalf of Reliable was counsel, who did not rebut any of the Authority's findings, but instead, challenged the constitutionality of the enabling statute. Counsel argued that "the Authority's oversight and sanctioning authority constituted an impermissible delegation of judicial functions, and a violation of separation of powers principle[s]." Counsel also contended that the relevant statutory language contained no enumerated safeguards or guidance to assess fines and

6

penalties, but instead, the broad statutory language gave the Authority unfettered discretion to impose a fine up to $2,000 for a violation.[3]

On September 16, 2013, the Authority issued a written decision. Stating that Reliable's failure to appear to give testimony was construed as an admission of guilt, the Authority decided that the recommended fines would be assessed. The Authority advised Reliable that it could accept the action taken by the Authority and pay the fines, or it could request judicial review in the circuit court.

Reliable petitioned for judicial review, and the parties filed memoranda. In its memorandum, Reliable raised the same constitutional issues that it had raised before the Authority, relying primarily on *County Council for Montgomery County v. Investors Funding Corp.*, 270 Md. 403 (1973).

The Authority argued that the court should "affirm the Authority's decision imposing civil penalties because it was based on substantial evidence." It also argued that PU § 12-135 was constitutional.

The Attorney General of Maryland also submitted a memorandum, "pursuant to his constitutional duty to defend the constitutionality of the duly enacted laws of the General Assembly," opining that the "Miss Utility law is, in all respects, constitutional." The Office of the Attorney General argued that Reliable's assertion that the delegation of adjudicatory powers to the Authority was unconstitutional was devoid of merit, stating that it is a "well-

---

[3] Counsel also argued that the Authority's notice of the civil penalty did not satisfy the requirements of due process because mailing a letter was not proper service on Reliable. That argument is not reiterated on appeal.

established proposition that administrative agencies may conduct administrative hearings in contested cases, find facts, and make determinations, so long as there is an opportunity for the judicial review of the agency decisions," which there clearly was in this case. It also disputed Reliable's assertion that the Miss Utility statute improperly vests the Authority with unrestricted, unbridled discretion in fixing penalties without safeguards or standards, asserting that the Authority could impose penalties only for a limited number of violations, and the legislature "cabined" the Authority's discretion by setting forth the elements of those violations in the statute.

On April 7, 2014, the circuit court held a hearing. On June 9, 2014, it issued a written decision affirming the decision of the Authority. The court explained its decision in a 20-page memorandum opinion.

The court initially addressed, and rejected, Reliable's argument that PU § 12-135 violated the Maryland Constitution by vesting plenary judiciary powers in the Authority to adjudicate cases involving violations of the Miss Utility statute. It explained:

> In *Investors Funding Corp.*, the Court of Appeals specifically addressed the issue of the separation of powers doctrine as it related to the delegation of alleged judicial authority to an administrative agency. The Court held that "the existence of th[e] doctrine does not itself inhibit the delegation to an administrative agency of a blend of executive or legislative powers with powers judicial in nature; the determining factor is not so much the specific powers granted to the administrative agency, but rather the relationship of the courts to the exercise of that powers. *Investors Funding Corp.*, 270 Md. at 436.
>
> This [c]ourt finds that above-quoted language instructive, and allows for the delegation of judicial or quasi-judicial powers to an administrative agency, so long as there is an opportunity for judicial review of an agency's decisions. *See Lussier v. Maryland Racing Comm'n*, 343 Md. 681, 707

(1996) ("[The Court of Appeals] ha[s] never allowed there to be a delegation to an administrative agency of adjudicatory power without insisting that it be accompanied by provisions for judicial review of the exercise of that power."). The Miss Utility statute expressly provides that all decisions of the Authority are subject to judicial review by the circuit courts of the State. As such, the Authority does not constitute an impermissible delegation of judicial or legislative power.

(Footnote omitted).

The court also rejected Reliable's argument that the Miss Utility statute violated the Maryland Constitution by vesting the Authority with "unrestricted, unbridled discretion" to assess penalties. Although acknowledging that, in *Investors Funding*, 270 Md. at 441, the Court of Appeals held that giving a commission discretion to impose a penalty without any legislative standards to guide the exercise of discretion "constituted an invalid delegation of legislative powers," the circuit court determined that *Investors Funding* was not dispositive in this case. It stated:

> [Reliable], however, overlooks the *Investors Funding* Court's recognition of the "trend of cases [] toward greater liberality in permitting grants of discretion to administrative officials, particularly in the fields of *public health and safety*, in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increase." *Investors Funding Corp.*, 270 Md. At 442 (emphasis added). In *Pressman v. Barnes*, 209 Md. 544, 555 (1956), for example, the Court of Appeals held that "where the discretion to be exercised relates to police regulations for the protection of public morals, health, safety, or general welfare, and it is impracticable to fix standards without destroying the flexibility necessary to enable the administrative officials to carry out the legislative will, legislation delegating such discretion without such restriction may be valid."

> In the present case, the discretion exercised by the Authority relates to underground facilities. That is, personal property that is "buried or submerged for use in connection with the storage or conveyance of water, sewage, oil, gas, or other substances; or the transmission or conveyance of electronic, telephonic, or telegraphic communications or electricity." [PU §

9

12-102(o)(1)]. Underground facilities include "pipes, sewers, conduits, valves, lines, wires, manholes, [and] attachments." [PU § 12-202(o)(2)].

Clearly, the regulation of the above-mentioned facilities directly relate to the health, safety, and general welfare of the public, as they affect basic utilities of modern life such as electricity, communication, and sewage management. The development, use, maintenance, and supervision of such facilities can be complicated, and involve private corporations, local and state government agencies, and the general public. In order to navigate the complexities of underground facilities damage prevention, the General Assembly created the Authority, and permitted it to exercise a certain degree of discretion in assessing penalties for violation of the Miss Utility Statute. Given the undeniable relation of underground facilities to the health and safety of the general public, and the inherent complexities of the underground facilities damage prevention, the [c]ourt finds the discretion of the Authority to be constitutionally permissible.

## STANDARD OF REVIEW

The issue in this case involves the constitutionality of PU § 12-135. Because this involves a legal issue, we engage in *de novo* review. *Schisler v. State*, 394 Md. 519, 535 (2006) ("As the question before the Court involves the interpretation and application of Maryland constitutional, statutory and case law, we shall review the case *sub judice* under a *de novo* standard of review."). *Accord Bd. of Educ. of Prince George's Cnty v. Marks-Sloan*, 202 Md. App. 59, 63 (2011), *aff'd*, 428 Md. 1, (2012).

## DISCUSSION

## I.

## Delegation of Power to the Authority

Reliable contends that PU § 12-135 is unconstitutional because the delegation of power to the Authority to adjudicate claims under the Miss Utility statute violates the constitutional requirement that all judicial power be vested in the courts of the state. *See*

10

Md. Const. Art. IV. It asserts that the Miss Utility statute gives the Authority broad power to regulate any person who "moves dirt," and because the Authority has no functions other than "to issue and decide its citations," the Authority is "an unconstitutional court."

The Authority contends that the circuit court properly found that PU § 12-135 does not constitute an impermissible grant or delegation of judicial power. It notes that, in *Investors Funding*, 270 Md. at 437, the Court of Appeals "explicitly recognized the constitutionality of quasi-judicial powers of administrative agencies," holding that questions of fact may be determined by an administrative agency as "long as the courts retain their inherent power to assess the sufficiency of evidence to support such factual conclusions and to review the actions of administrative agencies which are illegal, arbitrary, unreasonable or which impair personal or property rights." *Id.* The Authority contends that this "is exactly the situation at issue here," noting that it has the power to determine questions of fact regarding the Miss Utility statute, but its power is subject to judicial review. Accordingly, it asserts, the Miss Utility statute "in no way divests the judiciary of its constitutional power," and the General Assembly acted appropriately in delegating to the Authority the power to make factual determinations regarding violations of the Miss Utility statute.

The Authority further disputes Reliable's argument that the Miss Utility statute gives it broad power to regulate any person who "moves dirt," making the Authority's powers "wholly judicial." It contends that the Authority's power is "limited to furthering the stated statutory purpose," i.e., "to protect underground facilities, as well as prevent

11

death, property damage, and loss of public services." Indeed, it notes that § 12-103 provides:

> This subtitle does not apply to an excavation or demolition performed or to be performed by an owner or lessee of a private residence when the excavation or demolition is performed or to be performed:
>     (1) Entirely on the land on which the private residence of the owner or lessee is located; and
>     (2) without the use of machinery.[4]

We agree with the Authority that PU § 12-135 is not an unconstitutional delegation of judicial power. To be sure, as the Court of Appeals has stated, "any attempt to authorize an administrative agency to perform what is deemed a purely judicial function or power would violate the separation of powers principle" because "judicial power in Maryland is vested entirely and exclusively in the courts." *Maryland Aggregates Ass'n v. State*, 337 Md. 658, 676 (quoting *Shell Oil Co. v. Supervisor of Assessments of Prince George's Cnty*, 276 Md. 36, 47 (1975)), *cert. denied*, 514 U.S. 1111 (1995). The Court has recognized, however, that "the tasks of making factual determinations and resolving disputes are not reserved exclusively to the judicial branch of government." *Id.* at 677. Rather, "'the essence of judicial power is the final authority to render and enforce a judgment.'" *Id.* (quoting *Attorney General v. Johnson*, 282 Md. 274, 286 (1978)).

---

[4] Moreover, the Authority contends that, to the extent Reliable is contending that the statute is overly broad because it applies to anyone who "moves dirt," Reliable, a contracting company that provides grading and excavation services, is asserting the rights of a unknown third party, and therefore, it has no standing to challenge the law on that ground.

12

In *Maryland Aggregates Ass'n*, the Court explained that, "[i]n modern times, the complexity of governmental obligations has resulted in increasing reliance upon administrative agencies for the performance of both rulemaking and adjudicatory functions," and "delegation to administrative agencies of both legislative and adjudicatory power" has been recognized as legitimate. *Id.* Noting that the concept of separation of powers may "'encompass a sensible degree of elasticity,'" *id.* (quoting *Dep't of Natural Res. v. Linchester*, 274 Md. 211, 220 (1975)), the Court stated:

> "The constitutional doctrine of separation of powers . . . does not itself inhibit the delegation to an administrative agency of a blend of executive or legislative powers with powers judicial in nature; the determining factor is not so much the specific powers granted to the administrative agency, but rather the relationship of the courts to the exercise of that power."

*Id.* at 677-78 (quoting *Investors Funding*, 270 Md. at 436). Accordingly, the Court held that "an agency in the executive branch may ordinarily perform adjudicatory functions in harmony with the principle of separation of powers provided that there is an opportunity for judicial review of the agency's final determination." *Id.* at 678.

Here, there is no question that a person aggrieved by a decision of the Authority has an opportunity for judicial review. PU § 12-113(e) (providing for judicial review of the Authority's decisions); Md. Code (2014 Repl. Vol.) § 10-222 of the State Government Article ("SG") (providing for review of decisions of state administrative agencies). Indeed, Reliable exercised its opportunity for judicial review. Accordingly, because the court has the opportunity to review the Authority's decision and render a final decision, the delegation of quasi-judicial adjudicatory power to the Authority is not unconstitutional.

13

## II.

## Authority's Discretion to Fix Penalties

Reliable next argues that, even if the legislature properly could delegate "such broad powers" to an administrative body, the penalty imposed is unconstitutional because the statute "contains no guidance whatsoever as to how the Authority [should] decide the amount of any penalty it imposes," aside from the maximum penalty amounts of $2,000 and $4,000. It asserts that "the imposition of civil penalties without legislative safeguards or standards" to guide the Authority's exercise of its discretion "constitutes an invalid delegation of legislative powers."

The Authority contends that § 12-135 "provides sufficient safeguards and guidance for the Authority to assess penalties related to public health and safety." It notes, as did the circuit court, that Reliable "overlooks the *Investors Funding* 'trend of cases [] toward greater liberality in permitting grants of discretion to administrative officials, particularly in the fields of public health and safety, in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increase.'" (Quoting *Investors Funding*, 270 Md. at 442). The Authority asserts that its quasi-judicial function is directly related to the health, safety, and general welfare of the public, and given the "complexity of developing, maintaining, and regulating underground facilities," the General Assembly properly granted the Authority a "certain amount of discretion in assessing penalties" to protect the safety and welfare of the public.

14

In any event, the Authority argues that the statute does contain several guidelines and criteria that limit the circumstances under which a penalty is warranted.[5] It asserts that, given these limiting factors, "[c]oupled with the availability of judicial review of each Authority decision, the Miss Utility Statute constitutes sufficient guidelines and safeguards as contemplated by" the case law.

We begin our analysis with *Investors Funding*, 270 Md. at 441, upon which Reliable rests its argument. In that case, the Court of Appeals held that there were insufficient guidelines and standards set for the Montgomery County Commissioner of Landlord-Tenant Affairs (the "Commissioner") to impose civil penalties. Although the Court concluded that it was not "an invalid delegation of judicial power to an administrative agency" to give the Commission the power "to award money damages, terminate leases, order repairs and return of the security deposits and rental monies paid, and to award funds for temporary substitute housing," *id.* at 440-41, it reached a different conclusion with respect to the provision of Chapter 93A of the Montgomery County Code (the "Act'), which allowed the Commissioner to enforce the Act by imposing a civil penalty not exceeding $1,000. *Id*. at 437. In that regard, the Court stated:

> The power vested in the Commission . . . to enforce the provisions of the Act by imposing a civil penalty not exceeding $1,000 'for the violation of any provision of this Chapter' is far more elastic than its power to award money damages to a landlord or tenant for actual loss suffered by reason of

---

[5] The Miss Utility statute limits the situations in which the Authority has discretion to impose a civil penalty to the following circumstances: (1) an excavation or demolition must have been performed; (2) the excavation or demolition must have been performed without notice to the one-call system; and (3) the activity must have damaged, disturbed, or dislocated an underground facility. PU § 12-135

the Commission's finding of a defective tenancy. Indeed, it is readily apparent that the Commission has unrestricted, unbridled discretion in fixing the amount of the penalty, within broad limits, up to $1,000 without regard to the nature or gravity of the violation. While we conclude that the authority to impose a civil monetary penalty is not a power beyond constitutional delegation to an administrative agency, we think the discretion vested in the Commission to fix the amount of the penalty in any amount up to $1,000, for any violation of the Act, in the total absence of any legislative safeguards or standards to guide it in exercising its discretion, constitutes an invalid delegation of legislative powers and otherwise violates due process of the law requirements.

*Id.* at 441-42. Accordingly, the Court held that, "because of the complete lack of any legislative safeguards or standards, the grant of unlimited discretion to the Commission to fix civil penalties in any amount up to $1,000 is illegal." *Id.* at 442.

As the circuit court noted, however, the Court in *Investors Funding* recognized the "trend . . . toward greater liberality in permitting grants of discretion to administrative officials, particularly in the fields of public health and safety, in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increase." 270 Md. at 442. In doing so, the Court cited to *Pressman*, 209 Md. at 555, where it had held:

> Generally, a statute or ordinance vesting discretion in administrative officials without fixing any standards for their guidance is an unconstitutional delegation of legislative power. But we also hold, *as a qualification of the general rule, that where the discretion to be exercised relates to police regulations **for the protection of public morals, health, safety, or general welfare**, and it is impracticable to fix standards without destroying the flexibility necessary to enable the administrative officials to carry out the legislative will, legislation delegating such discretion without such restrictions may be valid*.

(Emphasis added).

16

In *Falik v. Prince George's Hosp. & Med. Ctr.*, 322 Md. 409 (1991), the Court reiterated:

> In a long line of cases, we have upheld broad delegations of legislative power to administrative agencies, particularly where it is impracticable for the legislature to set specific guidelines to govern the day-to-day exercise of the rule-making power. . . . [T]he modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increases.

*Id.* at 417-18.

Here, the legislative intent regarding the Miss Utility statute, and the establishment of the Authority pursuant to the PIPES Act, clearly is to protect the public health and safety. PU § 12-102 provides that the intent of the General Assembly was to protect underground facilities from damage, to prevent "death or injury to individuals," "property damage to private and public property," and "the loss of services provided to the general public." Because the regulation of underground facilities relates to the public health and safety, "greater liberality in permitting" discretion is permitted. *See Investors Funding*, 270 Md. at 442.

Although we are inclined to agree with the Authority and the circuit court that the statute's limitation on the circumstances in which the Authority has discretion to impose a civil penalty, along with the availability of judicial review of the Authority's decisions, would lead to the conclusion that the discretion given to the Authority is constitutional, we need not decide that issue. Although not cited by either of the parties, the General

17

Assembly has enacted a statute giving specific standards and guidelines for the Authority to use in exercising its discretion in imposing a penalty. SG § 10-1001 provides as follows:

> (a) *"Unit" defined.* — In this section, "unit" means an officer or other entity in the Executive Branch.
> (b) *Considerations in setting amount of penalty.* — Unless otherwise provided by statute or regulation, a unit of State government authorized by law to impose a civil penalty up to a specific dollar amount for violation of any statute or regulation shall consider the following in setting the amount of the penalty:
>> (1) the severity of the violation for which the penalty is to be assessed;
>> (2) the good faith of the violator; and
>> (3) any history of prior violations.

*See Garrity v. Md. State Bd. of Plumbing*, ___ Md. ___, No. 2171, Sept. Term, 2013, slip op. at 22 (filed Feb. 26, 2015) (SG § 10-1001 sets forth general guidelines on when an agency may assess a civil penalty).

The legislative history of SG § 10-1001 indicates that the statute was enacted specifically to address the problem identified in *Investors Funding*, when legislation authorized administrative agencies to assess a civil penalty without providing statutory guidelines. *See* Senate Judicial Proceedings Committee, Bill Analysis, Senate Bill 122 (1993) (Senate Bill 122 "is designed to address [*Investors Funding*] by codifying a basic set of guidelines for setting civil penalties while allowing an existing statute, ordinance, or regulation to control."); Letter from J. Joseph Curran, Jr., Attorney General of Maryland, to The Honorable William Donald Schaefer, Governor of Maryland (April 23, 1993) (Senate Bill 122 was passed to bring agencies into compliance with *Investors Funding*, "by establishing statutory standards, but without impinging on agency discretion to adopt different standards by rule."). Indeed, the Floor Report states:

18

According to the Attorney General's Office, only about 10% of the civil penalty bills enacted by the General Assembly since Investors Funding was decided have included standards. In the past, the Attorney General's Office has advised agencies to administratively set their own standards and many of them have done so; however, other units of government have not always followed this advice. This bill is designed to address this problem by codifying a basic set of standards for setting civil penalties while allowing an existing statute, ordinance, or regulation to control.

Senate Judicial Proceedings Committee, Floor Report, Senate Bill 122 (1993).

In light of the language of the statute and the legislative history, we hold that SG § 10-1001 sets forth statutory standards and guidelines for the Authority to consider in assessing a penalty. The statute specifically applies to "a unit of State government," and the General Assembly's intent that the Authority constitutes "a unit of State government" is evidenced by the requirement in PU § 12-114 that the Authority, whose members are appointed by the Governor, shall report to the Governor and the General Assembly pursuant to SG § 2-1246, which addresses publications that a "unit of State government" intends to submit. Because the Authority is "a unit of State government," and it is not as entity in the judicial branch or the legislative branch of State government, it is an entity in the executive branch. *See* 64 Op. Att'y Gen. Md. 151 (1979) (term "executive branch officers" is broad and includes all officers that are not judicial or legislative).

Accordingly, pursuant to SG § 10-1001, the Authority shall consider the factors listed in setting the amount of a civil penalty for a violation of the Miss Utility statute. As such, Reliable is incorrect in arguing that there is no legislative guidance "as to how the

Authority decides the amount of any penalty it imposes." Reliable's constitutional argument in this regard is devoid of merit.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 752

September Term, 2014

---

RELIABLE CONTRACTING COMPANY,
INC.

v.

MARYLAND UNDERGROUND
FACILITIES DAMAGE PREVENTION
AUTHORITY

---

Graeff,
Arthur,
Leahy,

JJ.

---

Concurring Opinion by Arthur, J.

---

Filed: April 30, 2015

I agree with the majority that PU section 12-135 is not an unconstitutional delegation of the judicial power. I also agree with the Authority and the circuit court that, because the statute concerns health and safety, because the statute itself defines a very narrow set of circumstances in which the Authority may impose a penalty, and because an aggrieved party has the right to judicial review of the Authority's decision, the General Assembly has not impermissibly vested the Authority with standardless discretion. I would, however, end the analysis there. I would not decide whether the Authority is a "unit of State government" – *i.e.*, "an entity in the Executive Branch" (SG section 10-1001(a)) – that is required to consider the specific factors in SG section 10-1001(b).

Not only did the parties not brief or argue that issue, but it is less than entirely clear that the Authority meets the statutory standard in SG section 10-1001(a). The Authority's website asserts that "is not a state agency and is prohibited by law from receiving any state budget funds or appropriations." http://www.mddpa.org (last visited April 21, 2015). Moreover, although its "members" "are appointed by the Governor," it "is a stakeholder-run organization that has the ability to enforce the Miss Utility Law in the form of mandatory training or fines for violators." *Id.* In fact, in this case, the Authority was defended not by the Attorney General, but by private counsel.

In short, I would leave the applicability of SG 10-1001 for another day, when the parties have fully briefed and argued the issue.